UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

|  |  |
|---|---|
| MORRIS RUCKER, | |
| Plaintiff, | Case No. 1:16-cv-00090 |
| v. | Judge William L. Campbell, Jr.<br>Magistrate Judge Alistair E. Newbern |
| CHERRY LINDAMOOD et al., | |
| Defendants. | |

To:     The Honorable William L. Campbell, Jr., District Judge

**REPORT AND RECOMMENDATION**

Pro se and *in forma pauperis* Plaintiff Morris Rucker filed this action under 42 U.S.C. § 1983 in 2016, alleging violations of his Eighth Amendment right to adequate health care while he was confined at South Central Correctional Facility (SCCF), a Tennessee Department of Correction (TDOC) institution in Clifton, Tennessee, operated by CoreCivic, a private company. (Doc. No. 160.) Rucker suffers from chronic obstructive pulmonary disease (COPD) and asthma, and his claims allege difficulty in obtaining medications that effectively treat the restricted breathing he experiences because of those conditions. (*Id.*) Rucker's amended complaint brings Eighth Amendment deliberate indifference claims against Defendants Nurse Practitioner Amy Franks and Dr. Yvonne Neau in their individual capacities and against Defendant CoreCivic CEO Damon Hininger in his official capacity. (*Id.*)

This Report and Recommendation addresses these defendants' second motion for summary judgment under Federal Rule of Civil Procedure 56. (Doc. No. 273.) Rucker has responded in opposition to the defendants' motion (Doc. Nos. 286, 287), and the defendants have filed a reply

(Doc. No. 290). Considering the parties' arguments and the summary judgment record, and for the reasons that follow, the Magistrate Judge will recommend that the defendants' second summary judgment motion be denied.

I.      **Background**

A.      **Factual Background**[1]

The Magistrate Judge set out the relevant facts in the summary judgment record in the report and recommendation addressing the defendants' first motion for summary judgment. (Doc. No. 264.) Those facts are repeated here for convenience with minor additions that are relevant to the defendants' present motion.

1.      **Rucker's COPD and Asthma Treatment**

Rucker suffers from asthma and COPD, a chronic inflammatory lung disease that causes obstructed airflow from the lungs. (Doc. Nos. 243-4, 275, 285-1.) On April 21, 2014, while incarcerated at TDOC's Riverbend Maximum Security Institution (RMSI), Rucker was seen by Dr. Richard D. Fremont, a private pulmonology specialist who recommended that Rucker be prescribed Advair, Spiriva, and Albuterol to treat his restricted breathing. (Doc. Nos. 243-4, 260-6.) RMSI's medical providers followed a drug formulary, which is a list of medications that providers may prescribe to people incarcerated in that facility without further approval. (Doc. No. 260-6.) Advair and Spiriva were not included on that list. (*Id.*) RMSI medical records show that, on December 19, 2014, Nurse Practitioner Lisa Jack and Dr. Hau La requested permission to prescribe Advair and Spiriva to Rucker, citing Dr. Fremont's recommendation and stating that medical staff had "[t]ried to keep [Rucker] on formulary med[ications,] but his condition . . .

---

[1]      The facts in this section are drawn from the parties' previously submitted summary judgment declarations and exhibits and second statements of undisputed material facts. (Doc. Nos. 243-3–243-7, 248, 260, 260-1–260-7, 275, 285-1.)

2

worsen[ed] [or showed] no improvement" when he was treated with other drugs. (*Id.* at PageID# 2910.) For example, RMSI records show that Rucker was prescribed Alvesco, but his symptoms worsened and RMSI medical staff determined that he could not tolerate it and added Alvesco to Rucker's list of allergies. (Doc. No. 260-6.)

On or around December 9, 2015, Rucker was transferred to SCCF, which is operated by CoreCivic.[2] (Doc. Nos. 275, 285-1.) The defendants state that, on the following day, SCCF medical provider Dr. Robert Coble "reviewed [Rucker's] medical file and renewed [his] prescription medications that had been prescribed to him at" RMSI. (Doc. No. 275, PageID# 3091, ¶ 20.) Rucker's "inmate medical file . . . contains [his] medical records while he [h]as been incarcerated in Tennessee prisons" (Doc. No. 243-5, PageID# 2342, ¶ 6). Nurse Practitioner Franks states that she "fully evaluated [Rucker] and reviewed his medical history" as part of a "medical intake screening" within two weeks of his arrival at SCCF (*id.* at PageID# 2344, ¶ 15).[3] Franks states that she "specifically reviewed what medications [Rucker] needed to treat his COPD and when [he] would require breathing treatments." (*Id.*) Based on that review and her examination of Rucker, she renewed his prescriptions for "ProAir, Atrovent, Zyrtec, Spiriva, Advair, his rescue inhalers and his breathing treatments as needed . . . for 180 days." (*Id.*)

SCCF medical providers also follow a drug formulary. (Doc. Nos. 275, 285-1.) Any drug not listed on the formulary must be approved by CoreCivic's regional medical director before it

---

[2]     Rucker remained incarcerated at SCCF until February 6, 2018, when he was transferred to TDOC's Northwest Correctional Complex. (Doc. Nos. 275, 285-1.)

[3]     Rucker disputes that Franks evaluated him within two weeks of his arrival at SCCF. (Doc. No. 285-1.) However, the medical records contain a chronic disease treatment plan form that Franks completed for Rucker and signed on December 22, 2015, thirteen days after his transfer. (Doc. No. 243-4.)

3

can be prescribed to an inmate. (Doc. Nos. 275, 285-1.) SCCF's formulary did not include Advair and Spiriva. (Doc. Nos. 243-4, 260-6.)

Dr. Neau was the CoreCivic regional medical director while Rucker was incarcerated at SCCF. (Doc. Nos. 275, 285-1.) SCCF medical records show that SCCF medical providers, including Franks, sometimes requested approval to prescribe Rucker Advair and Spiriva in addition to his other medications and that Neau sometimes granted those requests. (Doc. Nos. 2434, 260-6.) At other times, medical providers, including Franks, prescribed Rucker other medications for his COPD and asthma, such as Incruse Ellipta, Alvesco, and AirDuo. (Doc. Nos. 243-4, 260-6.) For example, on April 25, 2016, Rucker informed SCCF medical staff that he was running out of Advair. (Doc. No. 243-4.) Franks submitted an electronic non-formulary request to Neau for Advair on the same day. (Doc. No. 260-6.) On April 26, 2016, Neau asked Franks if she "[w]ould . . . consider Incruse [E]llipta" instead. (*Id.* at PageID# 2912.) Franks prescribed Rucker Incruse Ellipta on April 28, 2016, not knowing that this medication was also non-formulary. (Doc. Nos. 243-4, 260-6.) On May 2, 2016, Franks learned that Incruse Ellipta was not a formulary medication and made a non-formulary request for it; Neau approved that request on the same day and denied Franks's initial request for Advair. (Doc. Nos. 275, 260-6.) The defendants state that it normally "took approximately 1–3 days for a typical prescription to be filled after the nurse submitted the order to an outside pharmacy." (Doc. No. 275, PageID# 3088, ¶ 7.)

In the meantime, on April 28, 2016, Rucker reported to the SCCF clinic and requested a breathing treatment. (Doc. No. 243-4.) SCCF medical records show that, while Rucker was waiting to be treated, he began yelling at officers about the delay. (*Id.*) The officers explained to him that all the nurses were busy and that he would be seen as soon as possible. (*Id.*) Rucker

walked out and laid down in front of the clinic. (*Id.*) He asked for a stretcher, but medical staff instructed the officers that Rucker could walk. (*Id.*) The "officers sent him back to his unit" because "[h]e was hindering staff from doing their jobs . . . ." (*Id.* at PageID# 2333.) Less than twenty minutes later, Rucker "was found on the floor in the sally port waiting room . . . having a[n] as[th]mat[ ]ic attack." (*Id.*) "He was wheezing and appeared to be in distress." (*Id.*) Nurse Mills helped him up, gave him a breathing treatment, and stayed with him until his breathing returned to normal. (Doc. Nos. 243-4, 260-4.)

Rucker was admitted to the SCCF infirmary on May 7, 2016, and again on May 29, 2016, with breathing problems. (Doc. Nos. 243-4, 275, 285-1.) On May 24, 2016, Dr. Coble submitted a non-formulary request to Neau for approval to prescribe two doses a day of Advair to Rucker for his "[i]ncreasingly severe COPD" because "[Incruse] Ellipt[a] has been substituted for [A]dvair and [Rucker] has deteriorated[.]" (Doc. No. 260-6, PageID# 2914.) Coble noted that Rucker was going to be "evaluated by [a] pulmonologist as he is deteriorating rapidly[.]" (*Id.*) Neau approved the request for Advair on the same day. (*Id.*)

On July 11, 2016, SCCF transported Rucker to Nashville for a follow-up appointment with Fremont. (Doc. Nos. 275, 285-1.) Fremont recommended that Rucker continue using Advair twice a day, Spiriva once a day, and Albuterol aerosol treatments as needed. (Doc. Nos. 243-4, 260-1.) He also noted that Rucker should not use Atrovent or Duonebs while taking Spiriva. (Doc. Nos. 243-4, 260-1.) On July 15, 2016, Coble placed a non-formulary request to Neau for Spiriva, stating that Rucker had "[s]evere COPD" and Spiriva was "recommended by [a] pulmonary consultant[.]" (Doc. No. 260-6, PageID# 2915.) Neau approved the request ten days later on July 25, 2016. (*Id.*) Coble also prescribed Rucker Advair to be taken twice a day and Albuterol nebulizer treatments to be taken three times daily as needed. (Doc. No. 243-4.) Many of Rucker's

inhalers and medications were designated "keep on person," or "KOP," but nebulizer treatments were administered in the SCCF clinic. (Doc. Nos. 243-4, 275, 285-1.) SCCF medical records show that, on July 28, 2016, Franks ordered that Rucker only be given nebulizer treatments if he was symptomatic and his oxygen saturation level was below ninety-four percent. (Doc. Nos. 243-4, 275, 285-1.)

In January 2017, SCCF medical provider Dr. Bernhard Dietz switched Rucker off Spiriva and back to Incruse Ellipta with Neau's approval. (Doc. Nos. 243-4, 260-6.) Dietz continued to prescribe Rucker Advair, again with Neau's approval. (Doc. Nos. 243-4, 260-6.) In February 2017, Nurse Practitioner Debra Kelley prescribed Rucker Alvesco instead of Advair. (Doc. No. 243-4.) On March 17, 2017, Kelley submitted a non-formulary request to Neau for Spiriva, stating that Rucker had "[f]ailed on Alvesco[ and] Inc[r]use Ellipta[.]" (Doc. No. 260-6, PageID# 2918.) Neau asked "[h]ow many documented exacerbations" Rucker had experienced "in [the] past 6 months"; Kelley answered "6 in 6" and stated that pulmonary function tests "show[ed] severe obstruct[ion] . . ." (*Id.*) Neau approved the request for Spiriva on March 21, 2017. (*Id.*)

On March 30, 2017, Kelley submitted a non-formulary request for Advair, stating that Rucker was "[n]ot improving," was "recently approved for Spiriva[,]" and that his COPD was "[c]ontrolled on Spiriva [and] Advair[.]" (*Id.* at PageID# 2919.) Neau approved the request for Advair on March 31, 2017. (*Id.*) SCCF clinic records show that Rucker complained on July 6, 2017 that his "[i]nhaler was [d]iscontinued" and clinic personnel "tried to explain that [the] inhaler was changed" because of SCCF's "formulary . . . ." (Doc. No. 243-4, PageID# 2311.) Rucker later complained to Hininger and Neau that SCCF medical provider "Dr. [Joseph] Soldo" "replaced" his "Advair and Spiriva . . . with Alvesco" on July 6, 2017. (Doc. No. 260-4, PageID# 2884.) The record shows that Dr. Soldo submitted a non-formulary request to Neau for Advair and Spiriva on

July 18, 2017, stating that Rucker had "[n]o relief with Alvesco[.]" (Doc. No. 260-6, PageID# 2920.) Neau asked if Soldo would "consider Breo Ellipta[,]" but Soldo responded that "Ellipta was tried and ineffective for [Rucker]. . . ." (*Id.*) Neau approved Soldo's request for Advair and Spiriva on July 19, 2017. (*Id.*)

On January 5, 2018, Kelley again submitted a non-formulary request to Neau for Advair and Spiriva. (Doc. No. 260-6.) She stated that Rucker "ha[d] been tried on other inhalers without success[,]" including "[A]lvesco, [A]trovent, [and] . . . [E]l[l]ipta[.]" (*Id.* at PageID# 2921.) Neau denied the request on January 7, 2018, instructing Kelley to "try new formulary option AirDuo[.]" (*Id.*) Kelley discontinued Rucker's Advair and Spiriva prescriptions and prescribed AirDuo instead. (Doc. No. 243-4.) However, after discovering that AirDuo was on backorder, Kelley submitted another non-formulary request to Neau for Advair and Spiriva on January 22, 2018. (Doc. No. 275.) Neau approved the request after confirming that AirDuo was not available. (*Id.*)

### 2.     Rucker's SCCF Grievances

Rucker filed twenty-six grievances while incarcerated at SCCF, many of which concerned his medical care. (Doc. Nos. 275, 285-1.) The following grievances are relevant to Rucker's claims in this Court.

On April 25, 2016, Rucker filed a grievance complaining that Coble switched his Advair prescription from twice-a-day use to once-a-day use on April 18, 2016; that he was "hav[ ]ing a hard time breathing" because he "was out of Advair on 4-22-16[;]" and that the "medical staff" including "Dr. Coble" and the "N.P. nurses don't take [his] health problems serious[ly]." (Doc. No. 260-3, PageID# 2834.) In response to the grievance, Registered Nurse A. Paden reviewed

Rucker's medical chart on May 23, 2016, finding that "a request was sent to corporate" for Advair[4] on April 25, 2016, but "[t]hey denied the request and suggested [I]ncruse [E]llipta instead[.]" (*Id.* at PageID# 2835.) Paden stated that Incruse Ellipta "is the medication that is currently being given" and that, if it was "not beneficial[,]" Rucker should "sign up to see a provider in order to possibly switch to a different inhaler . . . ." (*Id.*) On May 24, 2016, Grievance Chairperson Sgt. Leigh Staggs found Rucker's grievance "[i]nappropriate per Policy 501.01 Sec[tion] VI H-8" because it concerned a "medical diagnosis." (*Id.* at PageID# 2833.) Rucker appealed Staggs's response on May 25, 2016. (*Id.*) The Inmate Grievance Committee, chaired by Staggs, again found Rucker's grievance inappropriate under Policy 501.01 Section VI.H.8, and Warden Cherry Lindamood agreed with the committee's response. (Doc. No. 260-3.) Rucker appealed again, and the TDOC Deputy Commissioner of Operations responded on June 16, 2016, by checking a box indicating that he concurred with Paden's response. (Doc. No. 243-7.)

On November 16, 2016, Rucker filed a grievance stating that he "was denied [his] breathing treatment" "by Nurse Robertson" because she said Rucker's "oxygen level was to[o] high" for a breathing treatment according to an "order" in his medical file. (Doc. No. 260-3, PageID# 2837–38.) Rucker stated that he asked Robertson "who wrote the order" but "she said it doesn't matter . . . it was policy." (*Id.* at PageID# 2838.) Rucker's grievance requested that SCCF officials tell him "who wrote the order and what policy is Nurse Robertson talking about." (*Id.* at PageID# 2837.) Paden responded to Rucker's grievance on November 17, 2016, stating that she had reviewed Rucker's chart; that his medical records from November 10, 2016, showed that his "oxygen saturation was 98% and [he] w[as] displaying no symptoms of respiratory distress"; and

---

[4] Paden's response mistakenly states that the request was for "[A]lvesco" (Doc. No. 260-3, PageID# 2835), but the undisputed record evidence shows that it was for "Advair" (Doc. No. 260-6, PageID# 2912).

that "nebulizer treatments are only administered when you are displaying symptoms of respiratory distress." (*Id.* at PageID# 2839.) On November 18, 2016, Staggs found Rucker's grievance inappropriate under Policy 501.01 Section VI.I.1 because it was the "same or similar" to another grievance. (*Id.* at PageID# 2837.) Rucker appealed, the Inmate Grievance Committee also found the grievance inappropriate under Policy 501.01 Section VI.I.1, and Lindamood agreed with the Committee's response. (*Id.* at PageID# 2837, 2840.) Rucker appealed again and, on December 21, 2016, the TDOC Deputy Commissioner checked a box indicating that he concurred with Paden's response. (Doc. No. 260-3.)

Rucker filed grievances on February 10, 2017, and February 24, 2017, complaining that Dietz had discontinued his Spiriva inhaler and replaced it with Incruse Ellipta without discussing the change with Rucker. (Doc. No. 260-3.) Rucker stated that he had suffered severe allergic reactions to Incruse Ellipta in the past, that Fremont had recommended he take Advair and Spiriva, and that his health was worsening without his Spiriva inhaler. (*Id.*) On February 15, 2017, Paden responded to Rucker's February 10, 2017 grievance, stating that she reviewed Rucker's file and "determined there is no allergy to [Rucker's] current inhalers listed in [his] medical file." (*Id.* at PageID# 2844.) Staggs concurred with Paden's response on February 17, 2017, and Rucker appealed. (Doc. No. 260-3.) On February 24, 2017, the Inmate Grievance Committee found that Rucker's grievance was inappropriate under Policy 501.01 Sections VI.I.1 and VI.H.8 because it was the same or similar to a prior grievance and concerned a medical diagnosis. (*Id.*) Lindamood agreed with the Committee's response. (*Id.*) Rucker appealed again (*id.*), and the Deputy Commissioner of Operations concurred with Paden's response on March 22, 2017 (Doc. No. 243-7). Paden responded to Rucker's February 24, 2017 grievance on March 1, 2017, again stating that "there is no allergy listed in [Rucker's] medical record for [his] current inhaler." (Doc. No. 260-3,

PageID# 2848.) She also stated that "[t]he inhaler has been recently changed in hopes it will work better for you." (*Id.*) On March 3, 2017, Staggs found that Rucker's February 24, 2017 grievance was inappropriate under Policy 501.01 Sections VI.I.1 and VI.H.8. (Doc. No. 260-3.) Rucker appealed, the Inmate Grievance Committee found the grievance inappropriate under the same policies, and Lindamood agreed with the Committee's response. (*Id.*) Rucker appealed again, and, on March 30, 2017, the TDOC Deputy Commissioner of Operations checked a box indicating that he concurred with Paden's response. (Doc. No. 260-3.)

On January 15, 2018, Rucker filed a grievance addressed to CoreCivic, Hininger, Neau, and TDOC Commissioner Tony Parker, complaining that Neau had discontinued his Advair and Spiriva keep-on-person inhalers and that "constantly discontinu[ing] [his] 'Advair and Spiriva'" showed deliberate indifference to his serious medical needs. (*Id.* at PageID# 2857.) Rucker stated that Nurse McClain had told him that Advair and Spiriva were "[n]on-[f]ormula[ry] medication[s]" and "ha[d] to be approve[d]." (*Id.*) Rucker further stated that Neau, who had never met or examined him, changed his Advair and Spiriva prescriptions "six (6) times within the last year, placing [his] life in danger[,] [a]ll because [the] Corporate Office keep[s] forcing [Rucker] to use medications that are not for COPD and Asthma[ ] to cut the money costs on the medications." (*Id.*) Rucker received an inappropriate grievance notification signed by Staggs on January 18, 2018, stating that his grievance was being returned without processing because it violated the following policies: (1) grieving "[a] diagnosis by medical professionals and medical co-pay is inappropriate" under "Policy #501.01 VI.(H)(8)"; (2) Rucker "ha[d] already filed a grievance on this issue. Inmates shall not be permitted to submit more than one grievance arising out of the same or similar incident" under "Policy #501.01 VI.(I)(1)"; and (3) "[a]buse of [g]rievance [p]rocedure. [Inmates] can only have one grievance pending at Level 1 for review"

under "Policy #501.01 VI.(I)(2)[.]" (*Id.* at PageID# 2855.) Rucker appealed on January 19, 2018. (Doc. No. 260-3.) By the time Paden reviewed this grievance on March 10, 2018, Rucker had been transferred to TDOC's Northwest Correctional Complex (NWCX). Paden responded that Rucker was "no longer housed at [SCCF], so we do not have his medical chart" and stated that she was "unable to answer his concerns without the chart." (*Id.* at PageID# 2859.) Grievance Chairperson Brenda Pevahouse concurred with Paden and also found that the grievance was "[i]nappropriate per [P]olicy 501.01 Section 6 I-1" prohibiting grievances about the "same or similar" occurrences. (*Id.* at PageID# 2856.) The response was appealed in Rucker's absence. The Inmate Grievance Committee found the grievance "[i]nappropriate per Policy 501.01 Sec[tion] VI I-1 Same/Similar" and Warden Lindamood agreed. (*Id.* at PageID# 2860.) This response was also appealed in Rucker's absence. On March 23, 2018, the TDOC Assistant Commissioner of Prisons checked a box indicating that he concurred with Paden's response. (Doc. No. 260-3.)

## B. Procedural History

### 1. Rucker's Pleadings and the Defendants' Motions to Dismiss

Rucker initiated this action on October 21, 2016,[5] by filing a complaint under 42 U.S.C. § 1983 alleging deliberate indifference to his serious medical needs, racial discrimination, and

---

[5] Under the standard governing filings by pro se incarcerated litigants—known as the "prison mailbox rule"—"a pro se prisoner's [pleading] is deemed filed when it is handed over to prison officials for mailing to the court." *Brand v. Motley*, 526 F.3d 921, 925 (6th Cir. 2008) (citing *Richard v. Ray*, 290 F.3d 810, 812–13 (6th Cir. 2002)). The rationale for this rule is that "*pro se* prisoners have no control over delays between the prison authorities' receipt of [a pleading] and its filing, and their lack of freedom bars them from delivering the [pleading] to the court clerk personally." *Houston v. Lack*, 487 U.S. 266, 273–74 (1988). Courts assume, "absent contrary evidence," that an incarcerated person delivered a legal filing to prison authorities "on the date he or she signed [it]." *Brand*, 526 F.3d at 925. Accordingly, all dates for Rucker's filings discussed in this Report and Recommendation refer to the dates on which Rucker signed his filings. Rucker signed his original complaint on October 21, 2016. (Doc. No. 1.)

retaliation by Franks and several other defendants, including Corizon Medical Services.[6] (Doc. No. 1.) The Court granted Rucker's application to proceed *in forma pauperis* and reviewed his complaint under 28 U.S.C. § 1915(e)(2). (Doc. Nos. 3, 4.) The Court found that Rucker had stated a colorable Eighth Amendment deliberate indifference claim against Franks but dismissed his racial discrimination claim against her. (Doc. Nos. 3, 4.) The Court also found that Rucker had stated a plausible Eighth Amendment claim against Corizon by alleging that, "as a result of an official Corizon policy or custom on approving certain medications, [Rucker] did not receive the treatment recommended by a physician." (Doc. No. 3, PageID# 52.) The Court's screening order also advised Rucker "to exercise due diligence to take discovery and conduct a reasonable investigation to promptly determine the actual names of the as-yet identified Defendants, and to file a timely motion pursuant to Fed[eral] R[ule] [of] Civ[il] P[rocedure] 15 for leave to amend his complaint to correctly identify these Defendants by their real names once their names are ascertained[.]" (Doc. No. 4, PageID# 58.)

Over the course of the next year, Rucker amended, supplemented, or attempted to amend or supplement his complaint more than nine times. (Doc. Nos. 7, 18, 29, 34, 38, 47, 67, 118, 122, 142.) For example, on January 18, 2018, Rucker filed a notice of "additional facts" stating he had discovered that his "'Advair and Spiriva Inhalers' [were] constantly being changed . . . by a Dr. Neau that work[s] in [the] 'Corporate Office' [who] ha[d] not examined [ ]or talk[ed] to" Rucker. (Doc. No. 118, PageID# 1213.) On January 25, 2018, Rucker moved for leave to amend

---

[6]     The other defendants named in Rucker's original complaint were Warden Lindamood, unidentified Jane Doe nurses, unidentified Centennial Medical Center employees, Dr. Ron Wilson, and Nurse McClain. (Doc. No. 1.) In screening Rucker's original complaint, the Court found that Rucker had stated a plausible claim of racial discrimination against McClain. (Doc. Nos. 3, 4.) Rucker's claims against Lindamood and Wilson did not survive the Court's screening process. (Doc. Nos. 3, 4.) Rucker later amended his complaint to name Nurse Chris May as a defendant. (Doc. Nos. 7, 63.)

his complaint to name CoreCivic, Hininger, and Neau as defendants, stating that he had discovered their identities through written discovery in this action. (Doc. No. 122.) To address all of Rucker's attempts to amend his pleading, the Court directed Rucker to file a combined motion to amend that addressed all of his proposed amendments and a single proposed amended pleading. (Doc. No. 150.) Rucker complied (Doc. Nos. 156, 156-1), and the Court granted Rucker's motion (Doc. No. 159) and docketed the amended complaint as the operative pleading in this action (Doc. No. 160). In so doing, the Court found that Rucker's amended complaint did not name Corizon as a defendant and directed the Clerk of Court to terminate it as a defendant in this action.[7] (Doc. No. 159.)

The amended complaint asserts claims for violation of Rucker's Eighth Amendment right to adequate medical care while incarcerated at SCCF against TDOC, Hininger in his official capacity as CoreCivic CEO, Franks, Neau, Soldo, and Nurse Heather Banks; racial discrimination under Title VI of the Civil Rights Act of 1964 against Nurse Rachel Westray; and violation of the Americans with Disabilities Act (ADA) against Job Coordinator Tonya Warner. (Doc. No. 160.) Defendants TDOC, Banks, Franks, Hininger, Neau, and Warner filed motions to dismiss Rucker's amended complaint under Federal Rule of Civil Procedure 12(b)(6).[8] (Doc. Nos. 165, 172, 181.) The Magistrate Judge recommended granting TDOC's, Banks's, and Warner's motions to dismiss and denying Franks's, Hininger's, and Neau's motions. (Doc. No. 196.) The Magistrate Judge also recommended dismissing Rucker's claims against Soldo, who had not been served, under 28 U.S.C. § 1915(e)(2) for failure to state a claim and allowing his racial discrimination claim against

---

[7]     The Court also found that the amended complaint did not name May or McClain and directed the Clerk of Court to terminate them as defendants. (Doc. No. 159.)

[8]     Corizon also filed a motion to dismiss (Doc. No. 162), which the Court denied as moot because Corizon had already been terminated as a defendant in this action. (Doc. Nos. 196, 199.)

13

Westray, who also had not been served, to proceed.[9] (*Id.*) The Court adopted the Magistrate Judge's report and recommendation on April 8, 2019, over Hininger, Franks, and Neau's objections. (Doc. No. 199.)

### 2. Hininger, Franks, and Neau's First Motion for Summary Judgment

On August 3, 2020, Hininger, Franks, and Neau filed a motion for summary judgment under Federal Rule of Civil Procedure 56, supported by a memorandum of law, a statement of undisputed facts, and several declarations and exhibits. (Doc. Nos. 243, 243-1–243-7.) The defendants argued that summary judgment was appropriate because: (1) Rucker did not administratively exhaust his deliberate indifference claims against Franks or his official capacity claim against Hininger as required by the Prison Litigation Reform Act (PLRA); (2) Rucker's official capacity claim against Hininger and any deliberate indifference claims against Neau arising out of acts that took place before June 25, 2017, were barred by the relevant statutes of limitations; (3) Rucker could not show that Franks and Neau were deliberately indifferent to his serious medical needs; and (4) Rucker could not show that CoreCivic policy caused him any constitutional injury. (Doc. No. 243-2.)

Rucker responded in opposition to the defendants' motion and filed a supporting memorandum of law, a response to the defendants' statement of undisputed material facts, and several exhibits. (Doc. Nos. 257–260-7.) Rucker argued that he administratively exhausted his claims because he complied with SCCF's grievance policies, that his official capacity claim against Hininger and claims against Neau are timely, and that the record evidence shows violations

---

[9] The U.S. Marshal Service attempted to serve Westray at multiple addresses identified by Rucker and by the Court without success. (*See* Doc. No. 295.) The Magistrate Judge denied Rucker's motion to issue a fourth summons to Westray and to extend the deadline for service under Federal Rule of Civil Procedure 4(m) and will recommend dismissal without prejudice of Rucker's claims against her by separate report and recommendation. (*Id.*)

of his Eighth Amendment rights. (Doc. No. 258.) The defendants replied, again arguing that Rucker failed to exhaust his administrative remedies and could not show any constitutional violations. (Doc. No. 261.)

The Magistrate Judge issued a report and recommendation finding that: (1) Hininger and Franks failed to show the absence of a genuine issue of material fact regarding whether Rucker exhausted his administrative remedies before filing his claims against them; (2) Hininger and Neau failed to show the absence of a genuine issue of material fact regarding whether the statutes of limitations had run on Rucker's claims against them; (3) Franks failed to show the absence of a genuine issue of material fact regarding whether she showed deliberate indifference to Rucker's serious medical needs by interrupting his Advair treatment, prescribing a less-effective alternative medication, and restricting his access to breathing treatments; (4) Neau failed to show the absence of a genuine issue of material fact regarding whether she disregarded serious risks to Rucker's health by repeatedly requiring and approving less-effective medications to treat his COPD and asthma; and (5) Hininger failed to show the absence of a genuine issue of material fact regarding whether CoreCivic's policies regarding non-formulary prescription drugs directly caused Rucker's alleged injuries. (Doc. No. 264.)

Franks, Neau, and Hininger objected to the report and recommendation (Doc. No. 269), arguing, among other things, that the Magistrate Judge erred by "[r]elying upon [c]laims [Rucker] [f]ailed to [a]ssert in his [a]mended [c]omplaint to [f]ind [i]ssues of [m]aterial [f]act" (Doc. No. 270, PageID# 3029). Franks argued that Rucker's "sole allegation against" her is that she restricted his access to breathing treatments and that Rucker "did not assert any claim against [her] for prescribing Incruse Ellipta instead of Advair." (Doc. No. 270, PageID# 3029–3030.) Neau argued that Rucker's "sole allegation against [her] is that she discontinued two of [his] medical

inhalers on or around January 2018" and that Rucker "did not assert any claim against" her for interrupting his Advair and Spiriva treatment in April 2016 or January 2017. (*Id.* at PageID# 3030.) Hininger argued that Rucker "did not allege that CoreCivic had a 'policy preference' for formulary medications." (*Id.*)

The District Judge found that each of these objections was "without merit" and "disagree[d] with [Franks, Neau, and Hininger] that the Report and Recommendation ha[d] 'altered' the claims raised by [Rucker.]" (Doc. No. 271, PageID# 3055–56.) However, the District Judge "accept[ed] Defendants' representation that they ha[d] been adversely impacted because they did not adequately address all the allegations considered by the Magistrate Judge" and "conclude[d] that Defendants should have an opportunity to do so." (*Id.* at PageID# 3056) The District Judge therefore denied Franks, Neau, and Hininger's first motion for summary judgment "without prejudice to refiling another motion for summary judgment that addresses all allegations outlined in the Report." (*Id.*) The Magistrate Judge then "set a briefing schedule for the defendants to present additional arguments in support of summary judgment . . . based on the existing summary judgment record evidence." (Doc. No. 272, PageID# 3058.)

### 3. Hininger, Franks, and Neau's Second Motion for Summary Judgment

Hininger, Franks, and Neau filed a second motion for summary judgment (Doc. No. 273) on May 5, 2021, accompanied by a supporting memorandum of law (Doc. No. 274) and a revised statement of undisputed facts (Doc. No. 275). The defendants' second motion argues that (1) Rucker has failed to administratively exhaust most of his claims against Hininger, Franks, and Neau; (2) Rucker's official capacity claim against Hininger and some of his deliberate indifference claims against Neau are barred by statutes of limitations; (3) Rucker cannot show that Franks and Neau violated his Eighth Amendment rights; and (4) Rucker cannot show that a CoreCivic policy led to any constitutional violations. (Doc. No. 274.)

Rucker responded in opposition to the defendants' second motion (Doc. No. 286) by filing a memorandum of law (Doc. No. 287), a response to the defendants' revised statement of undisputed material facts (Doc. No. 285), and several additional exhibits (Doc. Nos. 286-1–286-6, 288, 288-1–288-3).[10] Rucker asserts that the defendants' second motion for summary judgment is nearly identical to the first motion and again argues that he administratively exhausted his claims, that his claims are timely, and that a reasonable jury could find that Franks and Neau violated his Eighth Amendment rights and that CoreCivic's policy requiring corporate approval of his Advair and Spiriva prescriptions caused some of those violations. (Doc. No. 287.)

The defendants filed a reply arguing that Rucker's response to their revised statement of undisputed material facts does not cite record evidence and should not "be utilized as a basis to establish genuine issues of disputed material facts"[11] and reiterating their exhaustion, statutes of limitations, deliberate indifference, and policy arguments. (Doc. No. 290, PageID# 3614.)

## II.    Legal Standard

In resolving a motion for summary judgment, the Court must undertake "the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Under Federal Rule of Civil Procedure 56, a court must grant summary judgment if

---

[10]    Because the Magistrate Judge ordered that the second round of summary judgment briefing address only "the existing summary judgment record evidence" (Doc. No. 272, PageID# 3058), this Report and Recommendation does not consider the additional evidence Rucker submitted in opposition to the defendants' second motion for summary judgment.

[11]    Several of Rucker's responses to the defendants' revised statement of undisputed material facts do include citations to record evidence. Others do not, and the Court has considered his responses accordingly.

the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law[,]" and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The moving party bears the initial burden of demonstrating that no genuine issues of material fact exist. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets its burden, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (citation omitted); *see also Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 282 (6th Cir. 2012) ("Once a moving party has met its burden of production, 'its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.'" (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986))). The parties "must support" their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or, alternatively, by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)–(B). Courts must view the record evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009). However, if the moving party carries its initial burden, the non-moving party must show more than "[t]he mere existence of a scintilla of evidence

18

in support of" his or her position. *Anderson*, 477 U.S. at 252. In order to proceed to trial, "there must be evidence on which the jury could reasonably find" for the non-moving party. *Id.*

III.     **Analysis**

"District courts may in their discretion permit renewed or successive motions for summary judgment, particularly when the moving party has expanded the factual record on which summary judgment is sought." *Lexicon, Inc. v. Safeco Ins. Co. of Am., Inc.*, 436 F.3d 662, 670 n.6 (6th Cir. 2006) (alteration omitted) (quoting *Kovacevich v. Kent State Univ.*, 224 F.3d 806, 835 (6th Cir. 2000) (Gilman, J. concurring)). Here, the District Judge allowed the defendants an opportunity to file a second summary judgment motion "because they did not adequately address all the allegations" that were considered by the Magistrate Judge in recommending denial of their first motion. (Doc. No. 271, PageID# 3056.) The District Judge identified the unaddressed allegations to which each defendant objected as follows: (1) for Franks, "allegations regarding failure to renew [Rucker's] prescription for Advair by substituting another medication"; (2) for Neau, "any allegations about interrupting [Rucker's] Advair and Spiriva treatment in April 2016 or January 2017"; and (3) for Hininger, "the allegation that CoreCivic has a 'policy preference' for formulary medications." (*Id.* at PageID# 3055, 3056.)

The District Judge thus specified the allegations to which he afforded the defendants another chance to respond. However, many of the arguments that the defendants now make in support of their second motion for summary judgment are not related to those allegations and simply repeat or augment arguments made in their first motion. "[N]o federal litigant has an absolute right to bring multiple, piecemeal motions for summary judgment; rather, a successive Rule 56 motion may be filed only with the district court's authorization." *Essex Ins. Co. v. Foley*, 827 F. Supp. 2d 1326, 1329 n.2 (S.D. Ala. 2011) (first citing *Fernandez v. Bankers Nat'l Life Ins. Co.*, 906 F.2d 559, 569 (11th Cir. 1990); then citing *Siemens Westinghouse Power Corp. v. Dick*

*Corp.*, 219 F.R.D. 552, 554 (S.D.N.Y. 2004); then citing *Sanders v. York*, No. CIV S-05-1989, 2008 WL 1925232, *4 (E.D. Cal. Apr. 30, 2008); and then citing *McCabe v. Bailey*, No. 05-CV-73, 2008 WL 1818527, *1 (N.D. Iowa Apr. 4, 2008)); *see also id.* (observing "the importance of not allowing parties to 'treat their initial summary judgment motions as a 'dry run' which they would have an opportunity to redo or supplement—at considerable additional cost to opposing parties and at a considerable drain to scarce judicial resources—via a new Rule 56 motion later on to correct any deficiencies identified by opposing counsel or the court in processing the initial motion" (quoting *Middlegate Dev., LLP v. Beede*, Civ. Action No. 10-0565, 2011 WL 3475474, *11 n.26 (S.D. Ala. Aug. 9, 2011))). To the extent that the defendants' new arguments do not address the allegations identified by the District Judge as the basis of his order granting the opportunity to file a second motion or could have been made in their first summary judgment motion, the Court may decline to consider them. This Report and Recommendation addresses the defendants' arguments in full.

A.    **PLRA Exhaustion**

The PLRA requires plaintiffs to exhaust all available administrative remedies, including prison grievance procedures, before filing an action addressing the conditions of their confinement. 42 U.S.C. § 1997e(a); *Porter v. Nussle*, 534 U.S. 516, 524 (2002); *Himmelreich v. Fed. Bureau of Prison*s, 766 F.3d 576, 577 (6th Cir. 2014), *aff'd sub nom. Simmons v. Himmelreich* 578 U.S. 621 (2016). The purpose of this exhaustion requirement is to "afford[ ] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter*, 534 U.S. at 525; *see also Reed-Bey v. Pramstaller*, 603 F.3d 322, 324 (6th Cir. 2010) ("The point of the PLRA exhaustion requirement is to allow prison officials 'a fair opportunity' to address grievances on the merits, to correct prison errors that can and should be corrected and to create an administrative record for those disputes that eventually end up in court." (quoting

*Woodford v. Ngo*, 548 U.S. 81, 94–95 (2006))). "[T]o properly exhaust administrative remedies prisoners must 'complete the administrative review process in accordance with the applicable procedural rules'—rules that are defined not by the PLRA, but by the prison grievance process itself." *Jones v. Bock*, 549 U.S. 199, 218 (2007) (quoting *Woodford*, 548 U.S. at 88); *see also Mattox v. Edelman*, 851 F.3d 583, 590 (6th Cir. 2017) ("A prisoner exhausts his remedies when he complies with the grievance procedures put forward by his correctional institution.").

"[T]he PLRA's exhaustion requirement is a strict rule, but there are a few exceptions." *Does 8–10 v. Snyder*, 945 F.3d 951, 962 (6th Cir. 2019). The PLRA conditions the exhaustion requirement "'on the "availab[ility]" of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones.'" *Id.* (alteration in original) (quoting *Ross v. Blake*, 578 U.S. 632, 642 (2016)). An administrative remedy is available if it is "'capable of use' to obtain 'some relief for the action complained of.'" *Ross*, 578 U.S. at 642 (quoting *Booth v. Churner*, 532 U.S. 731, 738 (2001)). An administrative remedy is unavailable when: (1) "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates[;]" (2) "an administrative scheme . . . [is] so opaque that it becomes, practically speaking, incapable of use[;]" or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 643–44. The Sixth Circuit requires an incarcerated person to make "'some affirmative efforts to comply with the administrative procedures before analyzing whether the facility rendered these remedies unavailable.'" *Napier v. Laurel Cnty.*, 636 F.3d 218, 223 (6th Cir. 2011) (quoting *Braswell v. Corr. Corp. of Am.*, No. 3:08-0691, 2009 WL 2447614, at *7 (M.D. Tenn. Aug. 10, 2009)). If the record shows some effort, courts will assess "whether an inmate's efforts to exhaust were sufficient under the circumstances[.]" *Id.* at 224.

Failure to exhaust under the PLRA is an affirmative defense for which defendants bear the burden of proof. *Surles v. Andison*, 678 F.3d 452, 455 (6th Cir. 2012) (quoting *Jones*, 549 U.S. at 216). Accordingly, summary judgment may be granted "'only if defendants establish the absence of a "genuine dispute as to any material fact" regarding non-exhaustion.'" *Id*. at 456 (quoting *Risher v. Lappin*, 639 F.3d 236, 240 (6th Cir. 2011)). Because defendants also bear the burden of persuasion for this issue at trial, their "initial summary judgment burden is 'higher in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it.'" *Id*. at 455–56 (quoting *Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001)). If the defendants meet this burden, the plaintiff must "present 'significant probative evidence' to defeat the motion for summary judgment on this ground." *Napier*, 636 F.3d at 225 (quoting *Anderson*, 477 U.S. at 248).

## 1.    Exhaustion of Claims Against Hininger

In his first motion for summary judgment, Hininger argued that Rucker did not "complain[ ] about any CoreCivic policy or custom" in his January 15, 2018 grievance, which was the only grievance Rucker filed against Hininger. (Doc. No. 243-2, PageID# 2090.) Hininger also argued that Rucker "never filed a grievance complaining that CoreCivic policy led to a delay of '3 weeks' for him to receive his medications, which now serves as the basis of his official capacity claims . . . ." (*Id.*) The Magistrate Judge found that "Rucker's January 15, 2018 grievance states that CoreCivic's 'Corporate Office ke[pt] forcing [Rucker] to use medications that are not for COPD and Asthma, to cut the money costs on the medications'" and that "Rucker thus expressly grieved CoreCivic corporate policy regarding his prescription medications and appealed that grievance through every level of review provided by SCCF." (Doc. No. 264, PageID# 2982 (alterations in original) (quoting Doc. No. 260-3, PageID# 2857).)

In the second summary judgment motion, Hininger no longer asserts that Rucker's January 15, 2018 grievance did not address a CoreCivic policy. Instead, Hininger argues that the policy addressed by that grievance is not the policy that is the basis for Rucker's claims in this action. Hininger again asserts that the "sole allegation" underlying Rucker's official capacity claim against him "is that [it] took up to '[three] weeks' for [Rucker's] prescriptions to be filled because 'CoreCivic Corporate Office had to approve to pay the cost for the refills'" and not that CoreCivic's policy caused Rucker to be prescribed ineffective medications. (Doc. No. 274, PageID# 3070, n.2 (quoting Doc. No. 160, PageID# 1616, ¶ 14).). The crux of Hininger's exhaustion argument is that "[a] complaint about *delay* as opposed to the *type of medications being prescribed* are two completely different allegations." (*Id.* at PageID# 3070.) From that premise, he argues that Rucker's January 15, 2018 grievance addressed only a policy preference for non-COPD and asthma medications and therefore did not alert CoreCivic "to the *specific* alleged problems now addressed in this lawsuit"—that a CoreCivic policy caused undue delay in Rucker receiving his prescription refills.[12] (*Id.*) But Hininger fails to recognize that Rucker's claim against him is "about *delay*" and about "the *type of medications being prescribed*." Rucker claims that CoreCivic's policy preference for formulary medications delayed Rucker receiving effective

---

[12]      Hininger cites *Freeman v. Francis*, 196 F.3d 641, 644 (6th Cir. 1999), in support of his argument that Rucker has not exhausted the specific claim made against him. But *Freeman* did not address a plaintiff's failure to exhaust a specific claim and does not stand for the proposition for which Hininger employs it. Rather, in *Freeman*, the Sixth Circuit rejected a plaintiff's argument that the PLRA's exhaustion requirement "does not apply to assaults or excessive force claims on prisoners by prison officers." *Id.* at 643. In so doing, the Sixth Circuit noted that statutory language in the PLRA requires plaintiffs to exhaust § 1983 actions regarding "prison conditions" and that "[a] Supreme Court case decided before passage of the [PLRA] holds that the statutory language 'prisoner petitions challenging conditions of confinement,' includes both ongoing practices *and* specific acts of misconduct like those alleged here by plaintiff.'" *Id.* at 644 (quoting *McCarthy v. Bronson*, 500 U.S. 136, 139–43 (1991)).

treatment for his COPD and asthma when ineffective medications were prescribed to him because of the policy.

The Court has repeatedly articulated Rucker's official capacity claim in this way. The Court found in screening Rucker's original complaint that Rucker plausibly alleged "that as a result of an official . . . policy or custom on approving certain medications, [Rucker] did not receive the treatment recommended by a physician." (Doc. No. 3, PageID# 52.) In recommending denial of Hininger's motion to dismiss Rucker's amended complaint, the Court found that Rucker "ha[d] alleged the existence of a Core Civic policy requiring the 'Core Civic Corporate Office' 'to approve . . . pay[ment for] the cost' of 'refill[ing]' inmates' prescribed medications" and that Rucker argued that "the SCCF medical staff's repeated refusals to administer his prescribed medications appear[ed] to be related 'to the high costs of the medications' and, therefore, to Core Civic's refill approval policy." (Doc. No. 196, PageID# 1805 (second and third alterations in original) (first quoting Doc. No. 160, PageID# 1616, ¶ 14; and then quoting Doc. No. 193, PageID# 1766).) The Court accepted that recommendation over Hininger's objection, finding that Rucker "alleged a CoreCivic policy requiring corporate office approval of all prescription refills" and that Rucker's "medical condition became worse as a result of not having his inhalers for more than three weeks." (Doc. No. 199, PageID# 1829.) Most recently, in its order granting the defendants the opportunity to file a second summary judgment motion, the Court found that Rucker's amended complaint "alleges that local medical providers were required to obtain approval from higher-ranking CoreCivic employees in order to prescribe certain medications" and that, "[c]onstrued liberally, this allegation suggests that the reason for the high-level approval is CoreCivic's policy preference for less expensive prescription medicines." (Doc. No. 271, PageID# 3056 (citing Doc. No. 160, PageID# 1616, ¶ 14).)

24

Rucker's January 15, 2018 grievance addresses both aspects of his claim against Hininger. Rucker filed the grievance "against CoreCivic, which is [the] 'Corporate Office'; CEO Damon Hininger, TDOC, Commissioner Tony Parker, and Dr. Neau at [the] Corporate Office, for 'deliberate indifference' to [his] serious medical needs as to constantly discontinu[ing] [his] 'Advair and Spiriva' that was prescribed by a[ ] Pulmonary Physician Specialist . . . ." (Doc. No. 260-3, PageID# 2856–57.) Rucker states he was told that his Advair and Spiriva inhalers were "discontinue[d] by Dr. Neau" because they are "non-formula[ry] medication[s]" "that ha[ve] to be approve[d]" and that Neau changed these medications "six . . . times within the last year . . . [a]ll because [the] Corporate Office ke[pt] forcing [him] to use medications that are not for COPD and Asthma, to cut the money costs on the medications." (*Id.* at PageID# 2857.) Rucker further states that he "needs [those] medications daily . . . in[ ]order to survive." (*Id.*) The grievance thus sets out that Rucker did not receive Advair and Spiriva (delaying effective treatment) because the "Corporate Office," through Neau, kept prescribing other medications to cut costs (a policy preference for particular medications). In other words, when Rucker was denied daily use of Advair and Spiriva because Neau did not renew his prescriptions based upon that policy, effective treatment of his COPD and asthma was necessarily delayed.[13]

Rucker's January 15, 2018 grievance put the defendants on notice of his claim that he was being denied refills of Advair and Spiriva because of a CoreCivic policy to prescribe certain medications based on cost. That grievance, which Rucker appealed through every level of review

---

[13]     Hininger argues in a footnote that Rucker's "January 15, 2018, grievance did not allege CoreCivic had a policy preference for formulary medications either." (Doc. No. 274, PageID# 3070 n.2.) As explained, Rucker's grievance alleges that Neau denied refills of Advair and Spiriva because they were "[n]on-[f]ormula[ry] medications" "that ha[ve] to be approve[d]" and that the "Corporate Office" forced him to use other drugs "to cut the money costs on the medications." (Doc. No. 260-3, PageID# 2857.)

in the SCCF and TDOC system, thus exhausts his claim against Hininger whether it is construed as a claim that the policy denied Rucker the specific medications that worked for him or delayed effective treatment of his COPD and asthma with those medications. Hininger has failed to carry his burden to show "'that the evidence is so powerful that no reasonable jury would be free to disbelieve'" that Rucker failed to exhaust his official capacity claim. *Surles*, 678 F.3d at 455–56 (quoting *Cockrel*, 270 F.3d at 1056).

## 2. Exhaustion of Claims Against Franks

In the first summary judgment motion, Franks argued that, in the twenty-six grievances Rucker filed, "[n]ot once did he name, identify, or complain about any actions taken or not taken by Defendant Amy Franks." (Doc. No. 243-2, PageID# 2089.) Franks argued that TDOC policy, as adopted by SCCF, required grievances to identify the names of persons involved, and that Rucker had therefore failed to exhaust any claims against her. (*Id.*) The Magistrate Judge recommended rejecting Franks's argument, finding that Rucker had complained about "'N.P. Nurses' in his April 25, 2016 grievance" and that Rucker alleged Franks was the only nurse practitioner treating him at that time. (Doc. No. 264, PageID# 2984 (quoting Doc. No. 260-3, PageID# 2834).) Further, Rucker's November 10, 2016 grievance complained about Franks's July 28, 2016 order limiting his access to breathing treatments. (Doc. No. 264.) The Magistrate Judge also found that the record showed SCCF did not reject Rucker's April 25, 2016 grievance based on a policy requiring grievants to identify all SCCF officials by name and, "[w]hen prison officials decline to enforce their own procedural requirements and opt to consider otherwise-defaulted claims on the merits, so as a general rule will [courts]." (*Id.* at PageID# 2983 (first alteration in original) (quoting *Reed-Bey*, 603 F.3d at 325).) Finally, the Magistrate Judge found that the record evidence showed that SCCF rejected Rucker's April 25, 2016 and January 15, 2018 grievances in part as inappropriate under a TDOC policy prohibiting inmates from grieving medical diagnoses

and that "[i]t is well established that '[t]he non-grievability of [a claim] through the grievance process makes that remedy unavailable under the PLRA . . . .'" (*Id.* at PageID# 2896 (second, third, and fourth alterations in original) (quoting *Owens v. Keeling*, 461 F.3d 763, 769 (6th Cir. 2006)).) Because Franks did not address whether the SCCF grievance process was sufficiently available to Rucker to address his medical claims, she had not shown the absence of a genuine issue of material fact on that question.

The second motion for summary judgment repeats the argument that, under TDOC policy, "a grievance which fails to identify a specific individual to whom the plaintiff's complaints are directed is deemed inappropriate" and that Rucker failed to name Franks in any of his grievances. (Doc. No. 274, PageID# 3066.) Franks also relies on *Maher v. Tennessee*, No. 16-1314, 2020 WL 1325363, at *17 (E.D. Tenn. Mar. 20, 2020), to argue that the SCCF grievance process was sufficiently available to Rucker to address claims regarding his medical care. (Doc. No. 274.)

In *Maher*, the incarcerated plaintiff argued that that the grievance process at the Hardeman County Correctional Facility in Whiteville, Tennessee, was unavailable to him to exhaust medical claims because of the facility's policy "deeming a medical diagnosis inappropriate" for the grievance process. 2020 WL 1325363, at *6. The court found that the defendants had submitted a declaration stating that, "if the grievance chairperson determines that a matter is non-grievable, the inmate may appeal that decision itself." *Id.* The court further found that the plaintiff had "filed a medical grievance[,]" received a "substantive response" to that grievance, and "appealed that response through each administrative level" without "the Grievance Committee, the Warden, [ ]or the Commissioner's Office deem[ing] that medical grievance inappropriate." *Id.* The court therefore concluded, based on the record evidence, that the grievance process was sufficiently available to that plaintiff. *Id.* at *7.

Franks argues that Rucker's "experience mirrors the plaintiff's experience in *Maher*" (Doc. No. 274, PageID# 3072). But the record shows that, unlike in *Maher*, several of Rucker's grievances were found inappropriate under TDOC and SCCF policies because they addressed his medical care (Doc. No. 260-3) and Franks agrees that "there were occasions when the Grievance Chairperson found the grievances were 'inappropriate'" under those policies (Doc. No. 274, PageID# 3071–72). Further, even if the Court assumes that the grievance process was available to Rucker for his medical claims as it was to the plaintiff in *Maher*, Franks's argument that Rucker did not exhaust those claims still fails.

Franks argues that Rucker's April 25, 2016 grievance cannot have exhausted a claim that she interrupted his Advair treatment by prescribing other drugs because she did not prescribe Incruse Ellipta to Rucker until April 28, 2016. (Doc. No. 274.) But the record shows that SCCF included Franks's April 28, 2016 prescription of Incruse Ellipta as part of its response to Rucker's April 25, 2016 grievance. (Doc. No. 260-3.) Rucker's April 25, 2016 grievance stated that his Advair prescription had been decreased by half, that he had run out of Advair on April 22nd, and that he was having a hard time breathing. Paden responded to the grievance on May 23, 2016, stating that, "on 4/25/16 a request was sent to corporate requesting [Advair] . . . . They denied the request and suggested [I]ncruse [E]llipta instead. This is the medication that is currently being given." (*Id.* at PageID# 2835.) At a minimum, Paden's response creates a genuine issue of material fact that Rucker's April 25, 2016 grievance put SCCF officials on notice of the facts underlying his claim regarding Franks's change of Rucker's medication. *See Porter*, 534 U.S. at 524–25; *Reed-Bey*, 603 F.3d at 324. Further, Rucker had just filed and was still awaiting a response to the April 25, 2016 grievance when Franks prescribed Incruse Ellipta on April 28, 2016. (Doc. No. 260-3.) TDOC grievance policies provide that inmates are "not . . . permitted to submit more than one

28

grievance arising out of the same or similar incident[s]" and are "not . . . permitted to have more than one grievance pending at the first level of review." (Doc. No. 260-3, PageID# 2830.) The same policies provide that "[g]rievances must be filed . . . within seven calendar days of the occurrence or the most recent occurrences giving rise to the grievance." (*Id.* at PageID# 2827.) Because SCCF included Franks's April 28, 2016 prescription in its response to Rucker's April 25, 2016 grievance, and because that grievance was still pending when Rucker would have been required to grieve the April 28, 2016 prescription, there is also a genuine question of material fact as to whether SCCF's grievance process was available to Rucker to separately grieve Franks's April 28, 2016 prescription of Incruse Ellipta.

Franks also argues that Rucker cannot rely on his November 10, 2016 grievance to exhaust a claim based on Franks's July 28, 2016 order limiting his access to breathing treatments. Franks points out that TDOC policy requires grievances to "be filed within 'seven calendar days of the occurrence giving rise to the grievance.'" (Doc. No. 274, PageID# 3068 (citation omitted).) But the record evidence shows that the TDOC policy in question states that "[g]rievances must be filed . . . within seven calendar days of the occurrence *or the most recent occurrences giving rise to the grievance.*" (Doc. No. 260-3, PageID# 2827 (emphasis added).) Rucker's November 10, 2016 grievance states that Robertson denied him a breathing treatment on that date based on an order in his medical file and refused to tell Rucker who wrote the order. (Doc. No. 260-3.) The defendants state that, "[o]n July 28, 2016, Nurse Franks ordered that [Rucker] only be provided breathing treatments if he presented with symptoms indicating a need for a breathing treatment or if his oxygen level went below 94%." (Doc. No. 275, PageID# 3099, ¶ 51.) Construing this evidence in the light most favorable to Rucker, a reasonable jury could find that Franks's July 28, 2016 order was the order on which Robertson relied to deny Rucker a breathing treatment and that November

10, 2016, was the most recent date on which that order was effectuated.[14] There is thus a genuine issue of material fact that Rucker's November 10, 2016 grievance was timely because it was filed within seven days of the most recent application of Franks's order. The record shows that Rucker appealed the November 10, 2016 grievance through every level of review in the SCCF and TDOC system. Franks has failed to carry her burden to show that summary judgment is warranted on exhaustion grounds with regard to any of Rucker's claims against her.

### 3. Exhaustion of Claims Against Neau

The first summary judgment motion did not advance any exhaustion arguments regarding Rucker's claims against Neau. (Doc. No. 243-2.) In the second summary judgment motion, Neau argues that Rucker failed to exhaust his claims against her based on the denial of Advair and Spiriva in April 2016 and January 2017 because Rucker "filed only one grievance" against her "on January 15, 2018." (Doc. No. 274, PageID# 3070.)

The summary judgment evidence, construed in the light most favorable to Rucker, does not support Neau's argument. Paden's response to Rucker's April 25, 2016 grievance acknowledges that "a request was sent to corporate" for Advair on April 25, 2016, but "[t]hey denied the request and suggested [I]ncruse [E]llipta instead." (Doc. No. 260-3, PageID# 2835.) The undisputed record evidence establishes that Neau was the person at corporate who denied the April 25, 2016 request for Advair. (Doc. Nos. 243-6, 260-6.) Rucker also filed grievances on February 10, 2017, and February 24, 2017, complaining that Dietz had replaced his Spiriva

---

[14]     Paden's response to Rucker's November 10, 2016 grievance, which refers to Rucker's chart and paraphrases the language of Franks's order, supports that finding. Paden noted that Rucker's "oxygen saturation was 98%" when he requested the breathing treatment, that he was "displaying no symptoms of respiratory distress[,]" and that "nebulizer treatments [were] only administered when [Rucker] [was] displaying symptoms of respiratory distress." (Doc. No. 260-3, PageID# 2839.)

prescription with Incruse Ellipta. (Doc. No. 260-3.) Neau states in her declaration, and the record shows, that Neau approved Dietz's January 23, 2017 request to prescribe Incruse Ellipta to Rucker instead of Advair.[15] (Doc. Nos. 243-6, 260-6.) Finally, Rucker's January 15, 2018 grievance states that "Neau ha[d] changed [Rucker's] medications 'Advair and Spiriva Inhalers' six (6) times within the last year, placing [his] life in danger[.]" (Doc. No. 260-3, PageID# 2857.) This evidence creates a genuine issue of fact that Rucker's grievances regarding the denial of Advair and Spiriva prescriptions in 2016, 2017, and 2018 exhausted his claims against Neau because she was the corporate actor who denied the prescriptions and approved other medications instead. Neau has not carried her burden to show no genuine issue of material fact that Rucker failed to exhaust any of his claims against her.

### B. Statute of Limitations

"The statute of limitations, like exhaustion of administrative remedies, is an affirmative defense" for which defendants bear "the ultimate burden of proof . . . ." *Surles*, 678 F.3d at 458 (first citing Fed. R. Civ. P. 8(c); and then citing *Fonseca v. Consol. Rail Corp.*, 246 F.3d 585, 590 (6th Cir. 2001)). To prevail on this affirmative defense, defendants must show (1) that the statute of limitations has run and (2) that there is no genuine issue of material fact as to when the plaintiff's cause of action accrued. *Campbell v. Grand Trunk W. R.R. Co.*, 238 F.3d 772, 775 (6th Cir. 2001). Like exhaustion of administrative remedies, because defendants bear the burden of persuasion for this issue at trial, their "initial summary judgment burden is 'higher in that [they] must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it.'" *Surles*, 678 F.3d at 455–56

---

[15]     SCCF did not reject Rucker's February 10 or 24, 2017 grievances as untimely. (Doc. No. 260-3.)

(quoting *Cockrel*, 270 F.3d at 1056). "The statute of limitations applicable to a § 1983 action is the state statute of limitations applicable to personal injury actions under the law of the state in which the § 1983 claim arises." *Eidson v. Tenn. Dep't of Child.'s Servs.*, 510 F.3d 631, 634 (6th Cir. 2007). In Tennessee, the applicable limitations period is one year. *Id.* (citing Tenn. Code Ann. § 28-3-104). However, "[t]he date on which the statute of limitations begins to run in a § 1983 action is a question of federal law." *Id.* at 635. Generally, "the limitation period starts to run when the plaintiff knows or has reason to know of the injury which is the basis of his action." *Id.* However, for an incarcerated litigant who is required to administratively exhaust his claims under the PLRA before filing suit, "[t]he statute of limitations . . . is tolled while the plaintiff exhausts his required administrative remedies." *Surles*, 678 F.3d at 458 (citing *Brown v. Morgan*, 209 F.3d 595, 596 (6th Cir. 2000)).

### 1.    Official Capacity Claim Against Hininger

Hininger argued in the first motion for summary judgment that the statute of limitations had run on Rucker's official capacity claim against him because Rucker did not identify Hininger or CoreCivic as a defendant until he filed a proposed supplemental amended complaint on January 25, 2018.[16] (Doc. No. 243-2.) Hininger argued that Rucker's official capacity claim accrued in July 2016, citing the amended complaint's allegation that, "in July 2016, it took up to '[three] weeks' for [Rucker's] prescriptions to be filled because 'CoreCivic Corporate Office had to approve to pay the cost for the refills'" and that the statute of limitations on Rucker's official capacity claim therefore ran no later than July 2017. (Doc. No. 243-2, PageID# 2092 (quoting Doc. No. 160, PageID# 1616, ¶¶ 14, 15).) The Magistrate Judge recommended finding that Hininger

---

[16]    Hininger argued that Rucker filed his proposed amended complaint on January 29, 2018. (Doc. No. 243-2.) Rucker signed the proposed amended complaint on January 25, 2018. (Doc. No. 122-1.)

had not addressed Rucker's argument that his claims related back to the original complaint under Federal Rule of Civil Procedure 15(c) or that his claims addressed continuing violations and were timely under that doctrine; that Hininger had not addressed undisputed record evidence showing that CoreCivic's non-formulary prescription approval policy was applied to Rucker several times after July 2016, including in February 2017, March 2017, July 2017, and January 2018; and that Hininger therefore had not established that no question of fact existed as to the statute of limitations defense. (Doc. No. 264.)

The second motion for summary judgment repeats Hininger's argument that the statute of limitations on Rucker's official capacity claim ran no later than July 2017 and that the claims are untimely because Rucker did not name CoreCivic or Hininger as a defendant until he filed his amended complaint in January 2018. (Doc. No. 274.) Hininger addresses Rucker's arguments under Rule 15(c) and the continuing violations doctrine. Again, however, Hininger has failed to carry his burden to show no genuine issue of material fact that the statute of limitations has run or as to when Rucker's official capacity claim accrued. *See Campbell*, 238 F.3d at 775.

As a threshold matter, Hininger has not addressed the well-established rule that the statute of limitations on a claim subject to the PLRA's administrative exhaustion requirement does not begin to run until after the litigant exhausts his administrative remedies. *See Surles*, 678 F.3d at 458; *Brown*, 209 F.3d at 596. The Magistrate Judge has recommended finding a genuine dispute of fact that Rucker's January 15, 2018 grievance administratively exhausted Rucker's official capacity claim against Hininger. That grievance became final on March 23, 2018. (Doc. No. 260-3.) A reasonable jury could find that Rucker's official capacity claim against Hininger accrued on that date.

### a. Relation Back Under Rule 15(c)

Hininger argues that Rucker's official capacity claim against him accrued in July 2016 because Rucker's amended complaint alleges that he was told in July 2016 that the corporate office had to approve refills of his medications. (Doc. No. 274.) Based on this accrual date, Rucker would have had until July 2017 to bring a claim against Hininger. (*Id.*) Rucker filed his initial complaint on October 24, 2016, naming Corizon as the defendant to his policy claim. (Doc. No. 1.) Rucker filed a motion for leave to file a proposed amended complaint naming Hininger as a defendant in his official capacity on January 25, 2018.[17] (Doc. Nos. 122, 122-1). Applying Hininger's proposed July 2016 accrual date and the one-year statute of limitations, Rucker's claim against him is untimely unless a tolling doctrine applies.

Rucker first argues that his claim against Hininger in the amended complaint relates back to his original complaint under Rule 15(c). Rule 15(c) "governs when an amended pleading 'relates back' to the date of a timely filed original pleading and is thus itself timely even though it was filed outside an applicable statute of limitations." *Krupski v. Costa Crociere S.p.A.*, 560 U.S. 538, 541 (2010). Rule 15(c)(1) provides that an amendment relates back to the date of the original pleadings when:

> (A) the law that provides the applicable statute of limitations allows relation back;

---

[17] The Court did not rule on that motion and, instead, instructed Rucker to file a motion for leave to file a comprehensive amended complaint. (Doc. Nos. 150, 156, 156-1). "Federal courts have uniformly held that a claim set forth in an amended pleading is timely under the applicable statute of limitations, if the motion for leave to amend was filed before the statute of limitations had run." *United States v. Katz*, 494 F. Supp. 2d 641, 644 (S.D. Ohio 2006). The Sixth Circuit has held that "equitable tolling is appropriate" where a plaintiff "display[s] reasonable diligence in pursuing [his] rights" by "attempt[ing] to amend [his] complaint within the limitations period." *Hughes v. Region VII Area Agency on Aging*, 542 F.3d 169, 188–89 (6th Cir. 2008). The Court finds that Rucker's motion demonstrates reasonable diligence in attempting to amend his complaint under this standard.

(B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading; or

(C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:

(i) received such notice of the action that it will not be prejudiced in defending on the merits; and

(ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Fed. R. Civ. P. 15(c)(1).[18]

Hininger argues that Rucker's amended complaint does not relate back to Rucker's original complaint under Rule 15(c) because Rucker "never moved to substitute CoreCivic or . . . Hininger as defendants instead of a previously named defendant" that Rucker named by mistake. (Doc. No. 274, PageID# 3074.) To the extent Hininger asserts that a party cannot add or substitute a defendant by amending a pleading and must do so through a motion to substitute, Rule 15(c) directs otherwise. The rule addresses "[r]elation [b]ack of [a]mendments[,]" including "amendment[s that] change[ ] the party or the naming of the party against whom a claim is asserted." Fed. R. Civ. P. 15(c)(1)(C); *see also id.* (addressing "the party to be *brought in by amendment*" (emphasis added)). *Marlowe v. Fisher Body*, 489 F.2d 1057, 1064 (6th Cir. 1973), on which Hininger relies for this proposition, held that "[t]he 1966 amendment to [Rule 15(c)] which permits correction of misnomers does not permit the addition or substitution of new parties." 489 F.2d at 1064. But Rule 15(c) has been amended several times since 1973, including in 1991 "with respect to the problem of a misnamed defendant." Fed. R. Civ. P. 15(c)(3) advisory committee's

---

[18]     Although the application of Rule 15(c) to established facts may be considered a question of law, the question of whether a defendant "knew or should have known that the suit should have been brought against [him] is . . . patently factual . . . ." *Berndt v. Tennessee*, 796 F.2d 879, 884 (6th Cir. 1986).

note to 1991 amendment. The Supreme Court has held, interpreting the most recent version of Rule 15(c), that the rule permits "an amended pleading" to "change[ ] a party or a party's name" under certain circumstances, including "'a mistake concerning the proper party's identity.'" *Krupski*, 560 U.S. at 541 (quoting Fed. R. Civ. P. 15(c)).[19]

The critical question is whether Hininger "knew or should have known that" Rucker would have named him in his official capacity "but for a mistake concerning the proper party's identity." Fed. R. Civ. P. 15(c)(1)(C)(ii). Rucker's original complaint named Corizon Medical Services as a defendant (Doc. No. 1), and the Court found in screening Rucker's original complaint that Rucker had stated a plausible policy claim against Corizon because he "allege[d] that as a result of an official Corizon policy or custom on approving certain medications, [Rucker] did not receive the treatment recommended by a physician." (Doc. No. 3, PageID# 52.) Rucker's response in opposition to Corizon's motion to dismiss his complaint demonstrates that Rucker mistakenly thought the policy underlying the denial of his Advair and Spiriva prescriptions was Corizon's, not CoreCivic's. Rucker stated in his response that "Corizon denied . . . approv[al] [of] [his] medications," including "'Advair, Spiriva and Ventolin [i]nhalers[,]' that w[ere] recommended and ordered by a[ ] [p]ulmonary [p]hysician [s]pecialist" and that "Corizon refused to have [Rucker's] medications approve[d], due to the high costs of the medications." (Doc. No. 92, PageID# 940, 943; *see also id.* at PageID# 941 (alleging that Corizon "constantly" refused "to approve [his] medications").) Rucker later filed a notice of "additional facts" stating that he had

---

[19]    Hininger's reliance on *Asher v. Unarco Material Handling, Inc.*, 596 F.3d 313 (6th Cir. 2010), is also misplaced. The Sixth Circuit held in *Asher* that Rule 15(c)(1)(C) allows a plaintiff to amend his pleading to change a defendant or its name under certain circumstances but does not "permit[ ] relation back of an amendment adding otherwise untimely *plaintiffs* and their claims to a timely-filed complaint . . . ." *Id.* at 317 (emphasis added). Contrary to Hininger's assertion, *Asher* does not require a plaintiff to file a motion to substitute a newly named defendant for a mistakenly named defendant before invoking relation back under Rule 15(c)(1)(C).

discovered that his "'Advair and Spiriva Inhalers' [were] constantly being changed . . . by a Dr. Neau that work[s] in [the] 'Corporate Office' [who] ha[d] not examined [ ]or talk[ed] to" Rucker. (Doc. No. 118, PageID# 1213.) A short time later, Rucker moved for leave to amend his complaint to name CoreCivic, Hininger, and Neau as defendants, stating that he had discovered their identities through the written discovery that the Court had directed him to pursue to identify the proper defendants to his claims. (Doc. No. 122.) The proposed amended complaint Rucker attached to that motion named CoreCivic, Hininger, and Neau as defendants instead of Corizon. (Doc. No. 122-1.) Rucker's operative amended complaint names Hininger in his official capacity as CoreCivic's CEO and Neau. (Doc. No. 160.)

This circumstance is described in *Krupski*: "[A] plaintiff may know generally what party A does while misunderstanding the roles that party A and party B played in the 'conduct, transaction, or occurrence' giving rise to [his] claim." 560 U.S. at 549. Rucker thought that Corizon provided medical services at SCCF and misunderstood the role that Dr. Neau and CoreCivic played in setting and enforcing policy regarding formulary medications. The Supreme Court held in *Krupski* that, "[i]f the plaintiff sues party B instead of party A under these circumstances, [he] has made a 'mistake concerning the proper party's identity' notwithstanding [his] knowledge of the existence of both parties." *Id.*

Hininger has not argued that Rucker's claim against him does not arise out of the same transaction and occurrences "set out—or attempted to be set out—in" his original complaint under Rule 15(c)(1)(B). Fed. R. Civ. P. 15(c)(1)(B). The original complaint alleged that the "Corporate Office had to approve" Rucker's Spiriva prescription and that the approval process "could take up to 3 weeks . . . ." (Doc. No. 1, PageID# 7.) Rucker further alleged that this policy "ha[d] proven to be an ongoing problem . . . ." (*Id.*) Hininger also has not argued that he and CoreCivic lacked

notice of this action such that they will be prejudiced in defending against it. *See* Fed. R. Civ. P. 15(c)(1)(C)(i). Nor has he argued that Rucker's allegations about what turned out to be a CoreCivic policy were insufficient to alert him and the company to the fact that the action would have been brought against them but for Rucker's mistake in thinking the policy belonged to Corizon Medical Services. *See* Fed. R. Civ. P. 15(c)(1)(C)(ii). Accordingly, Hininger has not shown the absence of a genuine issue of material fact that Rucker's claim against him relates back to the filing date of his original complaint for statute of limitation purposes.

### b.   Continuing Violations Doctrine

Hininger also argues that the continuing violations doctrine is inapplicable to Rucker's official capacity claim against him. (Doc. No. 274.) "Under the continuing-violation doctrine, the court can consider as timely all relevant violations 'including those that would otherwise be time[-]barred.'" *Nat'l Parks Conservation Ass'n, Inc. v. Tenn. Valley Auth.*, 480 F.3d 410, 416 (6th Cir. 2007) (alteration in original) (quoting *Sharpe v. Cureton*, 319 F.3d 259, 267 (6th Cir. 2003)). Hininger relies on *Sharpe v. Cureton* for the familiar proposition that courts rarely extend the continuing violations doctrine to § 1983 actions. (Doc. No. 274.) But the Sixth Circuit explained in *Sharpe* that one of the "two distinct categories of continuing violations" recognized in the § 1983 context includes violations involving "a longstanding and demonstrable policy of discrimination." 319 F.3d at 266; *see also id.* at 266–67 (holding that proving a continuing violation under this theory requires showing that discrimination "'was the company's standing operating procedure'" (quoting *Burzynski v. Cohen*, 264 F.3d 611, 618 (6th Cir. 2001))). Hininger further relies on *Bruce v. Correctional Medical Services, Inc.*, 389 F. App'x 462 (6th Cir. 2010), to argue that "the continuing violation doctrine typically does not apply to Eighth Amendment claims." (Doc. No. 274, PageID# 3074.) But *Bruce* recognized the same exception for applying the continuing violations doctrine in Eighth Amendment cases where the "plaintiff[ ] could show a longstanding

38

and demonstrable policy of discrimination." 389 F. App'x at 466 n.1 (citing *Sharpe*, 319 F.3d at 268). The court declined to apply the continuing violations doctrine because the plaintiff "ha[d] not presented any evidence that would support [this] category of the continuing violation theory."[20] *Id.* at 466 n.1. The Second Circuit has also held "that the continuing violation doctrine can apply" to "an Eighth Amendment claim of deliberate indifference to serious medical needs" where the plaintiff "sufficiently alleged the existence of an ongoing policy of denying him medical treatment[,]" including "a policy of doctors and prison staff disregarding treatment recommendations." *Shomo v. City of N.Y.*, 579 F.3d 176, 182 (2d Cir. 2009).

For the continuing violations doctrine to apply, "the plaintiff must 'allege both the existence of an ongoing policy of [deliberate indifference to his or her serious medical needs] and some non-time-barred acts taken in the furtherance of that policy.'" *Id.* (alteration in original) (quoting *Harris v. City of N.Y.*, 186 F.3d 243, 250 (2d Cir. 1999)). Here, there is undisputed evidence of a CoreCivic policy requiring advanced approval of non-formulary medications prescribed at SCCF, including the only medications that effectively treated Rucker's COPD and asthma. There is also evidence of the repeated application of that policy to deny or delay Rucker's access to those medications despite SCCF medical providers' knowledge of his demonstrated need for them, including in February 2017, March 2017, July 2017, and January 2018, all of which took place less than one year before Rucker filed his proposed amended complaint naming Hininger in January 2018. (Doc. Nos. 243-4, 260-4, 260-6.) Because applications of the CoreCivic policy on

---

[20] Hininger also relies on *Young v. Tennessee Department of Correction*, No. 1:15-cv-00050, 2015 WL 8492463 (M.D. Tenn. Dec. 10, 2015), to argue that the continuing violations doctrine does not apply to a § 1983 deliberate indifference claim where "the instances of denied medical care of which [a] plaintiff complained were 'discrete unlawful acts[.]'" (Doc. No. 274, PageID# 3074 (quoting *Young*, 2015 WL 8492463, at *2).) But *Young* did not address the policy exception recognized in *Sharpe* and *Bruce*.

these later dates would render Rucker's official capacity claim timely, Hininger has not shown the absence of a genuine issue of material fact on this issue.

### 2.     Claims Against Neau

In the first summary judgment motion, Neau argued that any of Rucker's claims against her based on incidents that took place more than one year before he filed a proposed amended complaint on June 20, 2018, were barred by the statute of limitations.[21] (Doc. No. 243-2.) The Magistrate Judge found that Neau had cited no authority to support her cursory argument and "ha[d] not addressed Rucker's arguments regarding relation back under Rule 15(c) or the continuing violations doctrine." (Doc. No. 264, PageID# 2989.) The Magistrate Judge therefore recommended finding that "Neau ha[d] not carried her burden to show that the statute of limitations ha[d] run on any of Rucker's claims against her and that there [was] no genuine issue of material fact about when his claims accrued." (*Id.*)

The second motion for summary judgment repeats Neau's first statute of limitations argument—that, "[t]o the extent [Rucker] attempts to assert claims against [her] beyond an incident that occurred in January 2018, such claims are barred if the alleged incidents arose prior to June 2[0], 2017"—and also addresses Rule 15(c) and the continuing violations doctrine. (Doc. No. 274, PageID# 3075.) Neau's statute of limitations argument incorrectly assumes that Rucker's claims against her based on her actions in April 2016 and January 2017 accrued at the time she took those actions. (Doc. No. 274.) Again, however, it is well established that the statute of limitations for claims subject to PLRA exhaustion does not begin to run until after the litigant

---

[21]     Neau argued that Rucker filed his proposed amended complaint on June 25, 2018, the day the Court received and docketed it. (Doc. No. 243-2.) But Rucker signed his motion to amend and proposed amended complaint on June 20, 2018 (Doc. Nos. 156, 156-1), and they are deemed filed that day. *See Brand*, 526 F.3d at 925.

exhausts his administrative remedies. *Surles*, 678 F.3d at 458; *Brown*, 209 F.3d at 596. There is evidence in the record to support a finding that Rucker's April 25, 2016; February 10, 2017; and February 24, 2017 grievances administratively exhausted his deliberate indifference claims against Neau based on her denial of Advair in April 2016 and approval of Incruse Ellipta in January 2017. The record shows that Rucker appealed his April 25, 2016 grievance through every level of the SCCF and TDOC grievance system and that the TDOC Deputy Commissioner of Operations issued a final response on June 16, 2016. (Doc. Nos. 243-7, 260-3.) To the extent Rucker's claim against Neau is based on her April 2016 denial of Advair, the claim accrued no earlier than June 16, 2016. *See Surles*, 678 F.3d at 458; *Brown*, 209 F.3d at 596. The record shows that Rucker appealed his February 10 and 24, 2017 grievances through every level of the SCCF and TDOC grievance system and that the TDOC Deputy Commissioner of Operations issued final responses to those grievances on March 22 and 30, 2017. (Doc. Nos. 243-7, 260-3.) To the extent Rucker's claim against Neau is based on her January 2017 approval of Incruse Ellipta, the claim accrued no earlier than March 22, 2017. Rucker first moved for leave to file a proposed amended complaint naming Neau as a defendant on January 25, 2018.[22] (Doc. Nos. 122, 122-1.) Thus, there is a genuine dispute of material fact that Rucker's claims against Neau in the operative amended complaint based on her January 2017 approval of Incruse Ellipta—which accrued no earlier than March 22, 2018—are timely. It appears that the statute of limitations on Rucker's claims against

---

[22]     Even though Hininger acknowledges that Rucker's claims against him would be timely if Rucker filed his January 25, 2018 motion for leave to amend his complaint to name Hininger and Neau as defendants (Doc. No. 122) within the limitations period, Neau argues in the same brief—without explanation for the distinction—that Rucker's claims against her would only be timely if Rucker filed his June 20, 2018 motion for leave to file his proposed comprehensive amended complaint (Doc. No. 156) within the limitations period. (Doc. No. 274.) Because Rucker's January 25, 2018 motion for leave to amend is a diligent attempt to amend his complaint to name Neau as a defendant, Rucker's claims against Neau are timely if he filed that motion within a year of the accrual of his claims against her. *See Hughes*, 542 F.3d at 188–89.

Neau based on her April 2016 denial of Advair ran before Rucker moved to amend his complaint to name Neau. However, as explained below, Neau has not shown the absence of a genuine issue of material fact that this claim against her is timely because it relates back to Rucker's original complaint under Rule 15(c) or because the continuing violations doctrine applies.

Neau argues that Rucker's amended complaint naming her as a defendant does not relate back to his original complaint because Rucker "did not mistakenly name a party other than . . . Neau in any prior complaint, nor did he move to substitute her as a 'proper party' instead of a previously named defendant." (Doc. No. 274, PageID# 3075.) Neau, like Hininger, has failed to show the absence of a genuine dispute of material fact that Rucker mistakenly named Corizon as a defendant in his original complaint instead of Neau. In his response in opposition to Corizon's motion to dismiss, Rucker stated his mistaken belief that "Corizon denied . . . approv[al] [of] [his] medications," including "'Advair, Spiriva and Ventolin [i]nhalers[ ] . . . .'" (Doc. No. 92, PageID# 940; *see also id.* at PageID# 941 (alleging that Corizon "constantly" refused "to approve [his] medications").) Rucker later filed a notice of "additional facts" stating that he had discovered that his "'Advair and Spiriva Inhalers' [were] constantly being changed . . . by a Dr. Neau that work[s] in [the] 'Corporate Office' [who] ha[d] not examined [ ]or talk[ed] to" Rucker. (Doc. No. 118, PageID# 1213.) A short time later, Rucker moved for leave to amend his complaint to name CoreCivic, Hininger, and Neau, stating that he had discovered their identities through written discovery. (Doc. No. 122.) The proposed amended complaint Rucker attached to that motion named CoreCivic, Hininger, and Neau as defendants instead of Corizon. (Doc. No. 122-1.) Similarly, Rucker's unified amended complaint names Hininger in his official capacity as CoreCivic CEO and Neau in place of Corizon. (Doc. No. 160.) A reasonable jury could find that

42

Rucker made a mistake in na4ming Corizon instead of Neau.[23] Neau has failed to show an absence of a genuine dispute of material fact that Rucker's claims against her in the operative amended complaint relate back to his original complaint under Rule 15(c) and are therefore timely.

The second motion also repeats Hininger's argument regarding the continuing violations doctrine in the context of Rucker's claims against Neau, asserting that "the Sixth Circuit[ ] [has] prohibit[ed] [ ] the use of the continuing violation doctrine in Eighth Amendment access to medical care claims" and that "[a]ny allegation that [ ] Neau failed to appropriately provide care to [Rucker] would give rise to separate, discrete causes of action." (Doc. No. 274, PageID# 3075.) As explained above, the Sixth Circuit, like other circuits, recognizes that the continuing violation doctrine may apply to Eighth Amendment deliberate indifference claims for alleged violations involving policies. *See Sharpe*, 319 F.3d at 266–67; *Bruce*, 389 F. App'x at 466 n.1; *Shomo*, 579 F.3d at 182. There is at least a genuine dispute of material fact that Neau acted pursuant to CoreCivic's non-formulary prescription approval policy each time she approved or denied requests to prescribe Rucker non-formulary medications. There is therefore a genuine dispute of material fact regarding whether Rucker's claims are timely under the continuing violation theory.

---

[23] Like Hininger, Neau has not argued that Rucker's deliberate indifference claim against her does not arise out of the same transaction and occurrences "set out—or attempted to be set out—in" his original complaint under Rule 15(c)(1)(B). Fed. R. Civ. P. 15(c)(1)(B). The original complaint alleged that Rucker was having "an ongoing problem" getting his Advair and Spiriva inhalers because the "Corporate Office had to approve" those prescriptions. (Doc. No. 1, PageID# 7.) The undisputed record evidence shows that Neau was the person in CoreCivic's corporate office responsible for approving or denying non-formulary prescriptions. (Doc. Nos. 243-6, 260-6.) Neau has not argued that she lacked notice of this action such that she will be prejudiced in defending against it. *See* Fed. R. Civ. P. 15(c)(1)(C)(i). Nor has she argued that Rucker's original allegations were insufficient to alert her to the fact that the action would have been brought against her but for Rucker's mistake in thinking Corizon Medical Services was responsible for approving his Advair and Spiriva prescriptions. *See* Fed. R. Civ. P. 15(c)(1)(C)(ii).

## C.     Rucker's § 1983 Claims

"Section 1983 provides a civil enforcement mechanism for all inmates who suffer constitutional injuries at the hands of '[a]ny person acting under color of state law.'" *Ford v. Cnty. of Grand Traverse*, 535 F.3d 483, 494 (6th Cir. 2008) (alteration in original) (quoting 42 U.S.C. § 1983). To prevail on a claim under § 1983, a plaintiff must show "(1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Shadrick v. Hopkins Cnty.*, 805 F.3d 724, 736 (6th Cir. 2015) (quoting *Jones v. Muskegon Cnty.*, 625 F.3d 935, 941 (6th Cir. 2010)). Here, Rucker alleges that Franks, Neau, and Hininger were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. The defendants have not disputed that they are state actors for purposes of liability under § 1983. Because the defendants perform the traditional state functions of operating a prison and providing medical services to persons in state custody, they act under color of state law and are subject to suit under 42 U.S.C. § 1983. *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996) (quoting *Hicks v. Frey*, 992 F.2d 1450, 1458 (6th Cir. 1993)). The only question before the Court at summary judgment is whether there is a genuine issue of material fact that the defendants deprived Rucker of his Eighth Amendment rights.

### 1.     Rucker's Individual Capacity Claims Against Franks and Neau

The Eighth Amendment, which applies to state governments through the Fourteenth Amendment, "forbids prison officials from 'unnecessarily and wantonly inflicting pain' on an inmate by acting with 'deliberate indifference' toward the inmate's serious medical needs." *Berkshire v. Beauvais*, 928 F.3d 520, 535 (6th Cir. 2019) (quoting *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004)). A deliberate indifference claim against an individual actor has objective and subjective components. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Blackmore*, 390 F.3d at 895. The objective component requires showing the existence of a "sufficiently

serious" medical need. *Farmer*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). "[A] medical need is objectively serious if it is 'one that has been diagnosed by a physician as mandating treatment *or* one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Richmond v. Huq*, 885 F.3d 928, 938 (6th Cir. 2018) (quoting *Blackmore*, 390 F.3d at 897). The subjective component requires a plaintiff to show that the prison official had "a sufficiently culpable state of mind in denying medical care." *Blackmore*, 390 F.3d at 895 (quoting *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000)). Courts determine this subjective component "'in light of the prison authorities' current attitudes and conduct.'" *Id.* (quoting *Helling v. McKinney*, 509 U.S. 25, 36 (1993)). This showing "entails something more than mere negligence," but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. "Knowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference." *Blackmore*, 390 F.3d at 896 (quoting *Horn v. Madison Cnty. Fiscal Ct.*, 22 F.3d 653, 660 (6th Cir. 1994)).

The defendants have not argued that Rucker's COPD and asthma are insufficiently serious to satisfy the objective component, and the record evidence shows that doctors diagnosed Rucker with both conditions and mandated treatment. (Doc. No. 243-4, 260-1, 260-6.) Only the subjective component of the Eighth Amendment standard is at issue for purposes of summary judgment.

### a. Franks

Rucker alleges that Franks was deliberately indifferent to his serious medical needs because she was aware of his severe COPD and asthma, knew that Rucker had been prescribed several different medications to treat those conditions, and knew that those conditions had only

45

been controlled on a combination of Advair, Spiriva, and Albuterol as recommended by Fremont. Rucker claims that, with that knowledge, Franks discontinued his Advair prescription in April 2016 and limited his access to Albuterol breathing treatments starting in July 2016. Franks argues that her treatment of Rucker was medically appropriate and constitutionally sound.

### i. Discontinuing Advair

The second summary judgment motion argues that "[t]here is nothing in the record to challenge [Franks's] conclusion that prescribing" Rucker Incruse Ellipta instead of Advair "was an appropriate decision[.]" (Doc. No. 274, PageID# 3077.) Rucker argues that Franks's discontinuation of his Advair shows deliberate indifference to his serious medical need because she "was familiar with [his] TDOC medical records and prescription history" showing that his severe COPD and asthma had only been controlled with Advair and Spiriva inhalers and she nevertheless discontinued his Advair prescription. (Doc. No. 287, PageID# 3361.)

The Magistrate Judge found in the first report and recommendation that, "[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Darrah v. Krisher*, 865 F.3d 361, 372 (6th Cir. 2017) (alteration in original) (quoting *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976)). Nevertheless, the Sixth Circuit has repeatedly held "that the 'interruption of a prescribed plan of treatment could constitute a constitutional violation.'" *Id.* at 368 (quoting *Boretti v. Wiscomb*, 930 F.2d 1150, 1154 (6th Cir. 1991)). It is also well established that "a decision to provide an 'easier and less efficacious treatment' may suffice to establish deliberate indifference." *Id.* at 372 (quoting *Warren v. Prison Health Servs., Inc.*, 576 F. App'x 545, 552 (6th Cir. 2014)); *see also Estelle v. Gamble*, 429 U.S. 97, 103 (1976) (recognizing that "denial of medical care may result in pain and suffering[,] which no one suggests would serve any penological purpose").

46

Undisputed record evidence shows that Franks was aware of Rucker's severe COPD and asthma and had reviewed his medical files and his prescription history. (Doc. Nos. 243-4, 243-5, 260-6.) Those records show that repeated attempts to treat Rucker with medications other than Advair and Spiriva resulted in Rucker's condition deteriorating. (Doc. No. 260-6.) These facts give rise to a genuine question of material fact as to whether Franks's prescription of Incruse Ellipta instead of Advair showed deliberate indifference to Rucker's serious medical needs. (Doc. No. 264.) As the Magistrate Judge previously found,

> [i]n *Darrah v. Krisher*, the Sixth Circuit held that a reasonable jury could find that the defendant doctor disregarded a risk of serious harm to the incarcerated plaintiff by prescribing him a formulary drug even though the doctor knew, among other things, that the plaintiff "had been taking [a non-formulary medication] prior to his transfer, and that [it] had been the only effective treatment for his [serious medical condition] out of a number of other medicines that he had tried." 865 F.3d at 373. In *Darrah*, the only apparent reason for the defendant's decision to change the plaintiff's prescription was that new medication "was listed on the drug formulary." *Id.* at 372. Here, as in *Darrah*, the summary judgment evidence construed in the light most favorable to Rucker supports a reasonable inference that Franks knew that Rucker had previously tried a variety of medications for his COPD and asthma and that his symptoms had only been controlled on a combination of two doses of Advair a day, one dose of Spiriva a day, and Albuterol nebulizer treatments as needed. While Incruse Ellipta turned out to be a non-formulary medication, the record shows that Franks *thought* it was formulary at the time she prescribed it instead of the Advair she initially requested Neau approve. (Doc. Nos. 243-1, 243-5.) Construing this evidence in the light most favorable to Rucker, a reasonable jury could find that Franks's primary reason for changing Rucker's Advair prescription to Incruse Ellipta was because she thought it was formulary and that she disregarded a serious risk of harm to Rucker by prescribing him a less efficacious treatment despite her knowledge of his poor history on other medications.

(Doc. No. 264, PageID# 2994–95 (second, third, and fourth alterations in original).)

Franks admits that she "initially thought Incruse Ellipta was a formulary medication," but argues that she "did not switch [Rucker's] medication because it was a 'formulary' medication, but because she believed it was an appropriate step to take in an attempt to better manage [Rucker's] COPD." (Doc. No. 274, PageID# 3077.) The record shows that, following Rucker's complaint that he was running out of Advair, Franks first requested approval to increase Rucker's

47

Advair prescription to two doses per day. (Doc. No. 260-6.) When Neau asked Franks if she would "consider Incruse [E]llipta" instead of Advair, Franks responded "see order change." (*Id.* at PageID# 2912.) Franks thought Incruse Ellipta was a formulary medication, and the record shows that she prescribed Rucker Incruse Ellipta instead of the increased Advair she initially requested on Neau's suggestion. This evidence creates a question of fact regarding Franks's motivation for changing her medication request.

Franks further argues that "[t]he record does not support any assumption that . . . Franks acted with deliberate indifference by allowing [Rucker] to run out of his Advair medication in April 2016" and that "[n]othing in the record suggests that [she] 'knowingly' allowed [Rucker's] medications to 'run out.'" (Doc. No. 274, PageID# 3078.) Franks argues that Rucker reported to her "that he was *running out of* (not that he had run out of) Advair" and that she "timely respon[ded]" by requesting approval to renew his Advair prescription on the same day, changing that order to Incruse Ellipta three days later when Neau suggested it, and requesting approval to prescribe Incruse Ellipta as soon as she realized it was a non-formulary medication. (*Id.*) Sixth Circuit "precedent is clear that neglecting a prisoner's medical need and interrupting a prescribed plan of treatment, even for a relatively short period, can constitute a constitutional violation." *Darrah*, 865 F.3d at 374. There remains a genuine question of material fact as to whether an actionable interruption in Rucker's treatment happened here. There is evidence in the record from which a reasonable jury could find that Franks allowed Rucker to run out of Advair without providing a replacement medication for at least seven days. During that time, Rucker requested a breathing treatment at the SCCF clinic, was sent back to his housing unit without one after he began yelling about the wait time, and collapsed and suffered an asthma attack less than twenty minutes after being turned away from the clinic. A reasonable jury could find from this evidence

that Franks disregarded a risk of serious harm when she failed to renew Rucker's Advair prescription in April 2016.

### ii.  Restricting Access to Breathing Treatments

The second motion for summary judgment repeats Franks's argument that she is entitled to summary judgment on Rucker's Eighth Amendment deliberate indifference claim against her for limiting his access to breathing treatments because her actions complied with Fremont's recommendation that Rucker be given those treatments three times a day as needed. (Doc. No. 274.) The Magistrate Judge recommended rejecting this argument in the first report and recommendation, finding that the record evidence construed in the light most favorable to Rucker supported finding a genuine dispute of material fact regarding whether Franks disregarded a serious risk of harm to Rucker by limiting Rucker's access to breathing treatments beyond what Fremont intended. (Doc. No. 264.) The Magistrate Judge found that,

> [i]n September 2016, [Rucker] complained to TDOC's health services administrator that Fremont only recommended that the "nurses . . . check [his] vital signs" and "listen to [his] lungs to determine if [he] [was] wheezing" before administering a needed breathing treatment, but that Franks instituted the oxygen level requirement after she "told the other nurses that [he] [was] only faking to have shortness of breath" and was "using too much medication in the nebulizer." (Doc. No. 260-4, PageID# 2867.) He complained that his COPD "problems ha[d] elevated with her changing the specialist's orders." (*Id.*) Rucker also points to record evidence showing that, after he was transferred to NWCX, Fremont recommended that Rucker be allowed to keep a nebulizer machine in his cell so that he could more easily take breathing treatments three times a day. (Doc. No. 260-1.)

(Doc. No. 264, PageID# 2996.)

Franks has failed to carry her burden to show that summary judgment is warranted on this claim. Franks argues that "receiving a breathing treatment when it is not needed can be more detrimental than helpful to a patient's health" and that she issued her order limiting Rucker's access to breathing treatments "[i]n an effort to ensure that [Rucker] only received breathing treatments

'as needed[.]'" (Doc. No. 274, PageID# 3079.) Franks asserts that "[n]othing in the record contradicts" that her order "complied with Dr. Fre[ ]mont's direction that [Rucker] be allowed breathing treatments 'as needed' because [her order] set forth when said breathing treatments were 'needed.'" (*Id.* (citation omitted).) But Franks has not addressed Rucker's assertion that Franks told other nurses that he was faking shortness of breath and using too much medication and record evidence showing that Fremont later recommended allowing Rucker to keep a nebulizer machine in his cell to more easily take three nebulizer treatments a day. Construed in the light most favorable to Rucker, this evidence demonstrates a genuine dispute of material fact regarding whether Franks disregarded a serious risk of harm to Rucker by further limiting his access to prescribed breathing treatments and thereby delaying medical treatment.

Franks also argues that this claim fails because Rucker has failed to point to any record evidence showing any injury resulting from Franks's restriction of breathing treatments. (Doc. No. 274.) "[T]he Supreme Court has held[ ] [that] the test for deliberate indifference is whether there exists a '*substantial risk* of serious harm,' and does not require actual harm to be suffered." *Blackmore*, 390 F.3d at 899 (quoting *Farmer*, 511 U.S. at 837). Accordingly, the Sixth Circuit has "held that '[w]hen prison officials are aware of a prisoner's obvious and serious need for medical treatment and delay medical treatment of that condition for non-medical reasons, their conduct in causing the delay creates [a] constitutional infirmity.'" *Darrah*, 865 F.3d at 372 (alterations in original) (quoting *Blackmore*, 390 F.3d at 899). Franks is not entitled to summary judgment on this basis.

### b. Neau

Rucker alleges that Neau disregarded a serious risk of harm to his health by repeatedly requiring and approving prescription medications that were less effective than Advair and Spiriva, which his medical records show were recommended by a specialist and were the only medications

among several others tried that controlled his COPD and asthma. In the first motion for summary judgment, Neau argued that Rucker could not show that she "acted with 'deliberate indifference,' by advising . . . Kelley to prescribe [Rucker] AirDuo instead of Advair and Spiriva" in January 2018. (Doc. No. 243-2, PageID# 2097.) Neau argued that "AirDuo is essentially identical to Advair[;]" that "at no time did [she] believe that prescribing [Rucker] AirDuo would be detrimental to [Rucker's] health, nor did any person make her aware that they believed prescribing AirDuo would be detrimental to [his] health[;]" and that "no one made [her] aware that a specialist required [Rucker] to be prescribed specifically Advair and Spiriva . . . ." (*Id.*)

The Magistrate Judge previously found that:

[t]he undisputed record evidence shows that Neau recommended AirDuo in place of Advair and Spiriva in January 2018 because AirDuo was a formulary drug and Advair and Spiriva were not. (Doc. No. 260-6.) The Sixth Circuit has "recognize[d] that prisons have legitimate reasons to be concerned with the cost of medical treatment for inmates, and that a drug formulary can be an appropriate method of controlling such costs." *Darrah*, 865 F.3d at 372. However, it has also held that a reasonable jury could find that a defendant was deliberately indifferent to a prisoner's serious medical needs where the defendant knew, among other things, that non-formulary medications "had been the only effective treatment . . . out of a number of other medicines . . . tried" and nevertheless prescribed a formulary option solely because it was cheaper. *Id.* at 373. Neau has not addressed her simultaneous denial of approval for Rucker's Spiriva prescription. The record shows that Kelley told Neau in March 2017 that, without Spiriva, Rucker had experienced six exacerbations in his symptoms in six months. Nor has Neau addressed record evidence showing that she interrupted Rucker's Advair and Spiriva treatment in April 2016 by recommending that Franks prescribe Incruse Ellipta instead of Advair, which led to Rucker's admittance to the SCCF infirmary twice in May 2016 or evidence showing that she did so again in in January 2017 when she approved Dietz's request to replace Rucker's Advair with Incruse Ellipta, even though Coble had informed her that Incruse Ellipta caused Rucker's severe COPD to rapidly deteriorate the last time she recommended it. (Doc. Nos. 243-4, 260-6.)

(Doc. No. 264, PageID# 2997–98.) The Magistrate Judge therefore recommended finding that, construing this evidence in the light most favorable to Rucker, a reasonable jury could find that Neau knowingly disregarded serious risks to Rucker's health.

51

The second motion for summary judgment addresses only Rucker's allegation that Neau interrupted his Advair and Spiriva treatment in January 2018. (Doc. No. 274.) Neau asserts that she did not review inmates' charts or medical records "when making formulary and non-formulary decisions" and, instead, "relied upon information obtained from the applicable provider making the request[.]" (Doc. No. 274, PageID# 3080.) Neau further argues that Rucker cannot satisfy the subjective prong of the deliberate indifference test because the record evidence shows that she "was never made aware that" Rucker "was not receiving adequate medical care" or that "'specialist' orders required him to be on any specific medication[.]" (*Id.*) The record evidence, construed in the light most favorable to Rucker, does not support Neau's argument.

The record shows that SCCF providers repeatedly informed Neau about Rucker's need for Advair and Spiriva in making their requests to prescribe non-formulary medications. Coble informed Neau on May 24, 2016, that Rucker's health "ha[d] deteriorated" because "Ellipt[a] ha[d] been substituted for [A]dvair" and that Rucker was "being evaluated by [a] pulmonologist [because] he [was] deteriorating rapidly[.]" (Doc. No. 260-6, PageID# 2914.) On July 15, 2016, when Rucker was already receiving Advair, Coble told Neau that Spiriva had also been "recommended by [a] pulmonary consultant" treating Rucker. *(Id*. at PageID# 2915.) On March 17, 2017, Kelley informed Neau that Rucker had "[f]ailed on Alvesco[ and] Inc[r]use Ellipta[.]" (*Id.* at PageID# 2918.) Kelley told Neau on March 30, 2017, that Rucker's COPD was "[c]ontrolled on Spiriva [and] Advair[.]" (*Id.* at PageID# 2919.) On July 20, 2017, Soldo informed Neau that "Ellipta was tried and ineffective for" Rucker. (*Id.* at PageID# 2920.) And, on January 5, 2018, Kelley informed Neau that Rucker "ha[d] been tired on other inhalers without success[,]" including "[A]lvesco, [A]trovent, [and] . . . [E]l[l]ipta[.]" (*Id.* at PageID# 2921.) Based on this evidence, a reasonable jury could conclude that Neau knew Rucker had a serious need for Advair

and Spiriva and faced a serious risk of harm if he received other medications instead and nevertheless required or approved less-effective prescription medications to treat Rucker's COPD and asthma.

In the second summary judgment motion, Neau argues that Rucker cannot show that her refusal to approve Kelley's request to prescribe Rucker Advair and Spiriva in January 2018 amounts to deliberate indifference because "AirDuo is essentially identical to Advair." (Doc. No. 274, PageID# 3081." Neau cites *Mabry v. Antonini*, 289 F. App'x 895, 902 (6th Cir. 2008), in support of this argument, but *Mabry* addressed allegations that have no bearing on the Court's analysis here. Specifically, *Mabry* addressed an incarcerated plaintiff's allegations that prison doctors failed to diagnose him with a serious neurological disease. *Id.* at 900–03. The undisputed record evidence here shows that Rucker had already been diagnosed with severe COPD and asthma when he arrived at SCCF, that a pulmonologist had recommended treatment with Advair and Spiriva, that Advair and Spiriva were the only medications that effectively treated these conditions out of a number of other medications Rucker had tried, that SCCF providers made Neau aware of these facts, and that Neau repeatedly required Rucker's treatment with other drugs. The Sixth Circuit addressed a similar circumstance in *Darrah* and held that a reasonable jury could find that a defendant was deliberately indifferent to a prisoner's serious medical needs where the defendant knew, among other things, that non-formulary medications "had been the only effective treatment . . . out of a number of other medicines . . . tried" and nevertheless prescribed a formulary option solely because it was cheaper. 865 F.3d at 373. There is a genuine dispute of material fact about whether that happened here.

Neau also argues that her refusal to approve Spiriva in January 2018 cannot constitute deliberate indifference because Kelley resubmitted the Spiriva request "[w]ithin two weeks of . . .

Neau['s] den[ial]" and Neau then approved it. (Doc. No. 274, PageID# 3081.) Neau has not cited any authority to support her argument that a two-week interruption in Rucker's treatment with Spiriva cannot establish deliberate indifference, and Sixth Circuit "precedent is clear that neglecting a prisoner's medical need and interrupting a prescribed plan of treatment, even for a relatively short period, can constitute a constitutional violation." *Darrah*, 865 F.3d at 374.

Like Franks, Neau argues that Rucker's claim against her fails because he has not pointed to any record evidence suggesting that he suffered injury when Neau denied Kelley's request to prescribe Advair and Spiriva in January 2018. (Doc. No. 274.) "[T]he Supreme Court has held[ ] [that] the test for deliberate indifference is whether there exists a '*substantial risk* of serious harm,' and does not require actual harm to be suffered." *Blackmore*, 390 F.3d at 899 (quoting *Farmer*, 511 U.S. at 837). The Sixth Circuit has therefore "held that '[w]hen prison officials are aware of a prisoner's obvious and serious need for medical treatment and delay medical treatment of that condition for non-medical reasons, their conduct in causing the delay creates [a] constitutional infirmity.'" *Darrah*, 865 F.3d at 372 (alterations in original) (quoting *Blackmore*, 390 F.3d at 899).

There are genuine questions of material fact regarding whether Neau was deliberately indifferent to Rucker's serious medical needs and summary judgment is not appropriate on this claim.

## 2. Rucker's Official Capacity Claim Against Hininger

Rucker alleges that Hininger is liable in his official capacity as CoreCivic CEO for violations of Rucker's Eighth Amendment rights because CoreCivic had a policy requiring advanced approval of all non-formulary medications, including Rucker's Advair and Spiriva. Claims against an individual in his or her official capacity are treated as municipal liability claims against the entity for which the individual is an officer or agent. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). The Supreme Court has held that a government body or private entity performing

a government function "can be found liable under § 1983 . . . where the [entity] *itself* causes the constitutional violation at issue" through execution of its own policies or customs. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (citing *Monell v. NYC Dep't of Soc. Servs.*, 436 U.S. 658, 694–95 (1978)). The overarching question in resolving such claims is "whether there is a direct causal link between [the entity's] policy or custom and the alleged constitutional deprivation." *Id.* For purposes of municipal liability claims, "individuals sued in their official capacities stand in the shoes of the entity they represent." *Alkire v. Irving*, 330 F.3d 802, 810 (6th Cir. 2003). Here, Hininger is a proxy for CoreCivic.

Courts in this circuit engage in a two-pronged inquiry when considering municipal liability claims under Section 1983. *Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592, 606–07 (6th Cir. 2007) (quoting *Cash v. Hamilton Cnty. Dep't of Adult Prob.*, 388 F.3d 539, 542 (6th Cir. 2004)); *Doe v. Claiborne Cnty.*, 103 F.3d 495, 505 (6th Cir. 1996) (explaining that "[a] municipal liability claim . . . must be examined by applying a two-pronged inquiry"). "We first ask whether the plaintiff has asserted the deprivation of a right guaranteed by the Constitution or federal law." *Powers*, 501 F.3d at 607 (first citing *Cash*, 388 F.3d at 542; and then citing *Alkire*, 330 F.3d at 813). Second, we ask whether the defendant entity is "responsible for that deprivation." *Cash*, 388 F.3d at 542 (citing *Doe*, 103 F.3d at 507); *cf. Powers*, 501 F.3d at 607 (asking "whether the alleged deprivation was caused by the defendants . . .").

Under the first prong of a municipal liability analysis, courts must consider whether the plaintiff has asserted "rights [that] are federally protected such that, if proven, § 1983 will provide relief for their infringement." *Powers*, 501 F.3d at 607; *see also Cash*, 388 F.3d at 542 ("First, the court must determine whether the plaintiffs have asserted the deprivation of a constitutional right." (citing *Doe*, 103 F.3d at 505)). Importantly, this prong of the inquiry asks the court to "examin[e]

the nature of the right claimed to have been infringed upon" and not to determine the merits of the claim. *Doe*, 103 F.3d at 506; *see also Cash*, 388 F.3d at 542 ("The threshold question is 'whether the interest at stake is within the Fourteenth Amendment's protection of liberty and property.'").

Hininger does not argue that Rucker has failed to assert a federally protected right. Instead, Hininger argues that Rucker's municipal liability claim fails because he cannot establish that he suffered a constitutional violation. This argument is misplaced. There is no question that Rucker has asserted that the denial of adequate medical care at SCCF violated his Eighth Amendment rights, and that is all he must do at this step of the analysis. Further, even assuming that Rucker were required to prove a constitutional violation at the first prong of the municipal liability inquiry, there are genuine disputes of material fact regarding Rucker's claims that Franks and Neau violated his Eighth Amendment rights by applying the CoreCivic policy at issue.

Under the second prong of the municipal liability inquiry, plaintiffs "must 'identify the policy, connect the policy to the [municipal entity] itself and show that the particular injury was incurred because of the execution of that policy.'" *Graham ex rel. Est. of Graham v. Cnty. of Washtenaw*, 358 F.3d 377, 383 (6th Cir. 2004) (quoting *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993)). A plaintiff may prove the existence of a policy or custom that is actionable under § 1983 in four ways:

> The plaintiff can look to (1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations.

*Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (citations omitted).

Hininger argues that "there is nothing in the record to suggest that CoreCivic had a 'policy preference' to prescribe formulary drugs to the detriment of [Rucker's] health." (Doc. No. 274, PageID# 3083.) But the defendants' statement of undisputed material facts asserts that CoreCivic

requires SCCF medical providers to seek approval from the CoreCivic regional medical director before prescribing any non-formulary drugs to patients incarcerated at SCCF. (Doc. No. 275.) It is therefore undisputed that CoreCivic policy requires advanced approval from the regional medical director to prescribe non-formulary drugs. It is also undisputed that Advair and Spiriva were considered non-formulary drugs at SCCF while Rucker was incarcerated there. (Doc. Nos. 260-6, 275.)

Hininger argues that Rucker cannot show that this policy was "the 'moving force' of any alleged constitutional deprivation" because Neau "only denied non-formulary requests when she believed an alternative medicine could appropriately treat the inmate in question" and "denied non-formulary requests [for Rucker] on only *two* occasions." (Doc. No. 274, PageID# 3083, 3084.) The record evidence, construed in the light most favorable to Rucker, could support a reasonable jury's finding that CoreCivic's policy preference for formulary medications caused SCCF providers to interrupt Rucker's treatment with Advair and Spiriva, the only drugs out of many alternatives tried that controlled Rucker's severe COPD and asthma. Specifically, the record shows that, before his transfer to SCCF, RMSI medical staff had "tried to keep [Rucker] on formulary meds[,] but his condition . . . worsen[ed] [or showed] no improvement" when he was taken off of Advair and Spiriva. (Doc. No. 260-6, PageID# 2910.) RMSI providers tried treating Rucker with Alvesco but his symptoms worsened and RMSI medical staff determined that he could not tolerate it, adding Alvesco to Rucker's list of allergies. (Doc. No. 260-6.)

After Rucker's transfer to SCCF, Franks initially prescribed him Incruse Ellipta instead of Advair in April 2016 because she thought it was a formulary drug, and the interruption of Rucker's treatment with Advair ultimately resulted in his collapse outside the SCCF clinic during an asthma attack. (Doc. Nos. 243-4, 260-4, 260-6.) In February 2017, Kelley replaced Rucker's Advair

prescription with Alvesco, a formulary option, even though Rucker's medical records showed he could not tolerate that drug and it did not help his COPD and asthma symptoms. (Doc. No. 234-4, 260-6.) Kelley later reported that Rucker "[f]ailed on Alvesco[.]" (Doc. No. 260-6, PageID# 2918.) And, in January 2018, Neau interrupted Rucker's Advair and Spiriva treatment by denying Kelley's request to prescribe these drugs and directing to Kelley to prescribe AirDuo because it was a formulary drug. (Doc. No. 260-6.) There is therefore record evidence sufficient to create a genuine dispute of material fact about "whether there is a direct causal link between" the identified CoreCivic policy and Rucker's alleged injuries. *City of Canton*, 489 U.S. at 385.

Hininger also argues that Rucker's official capacity claim fails because Rucker "has not set forth any medically verifiable proof that . . . any . . . alleged delay [in receiving medications] actually caused any detrimental effect to his health." (Doc. No. 274, PageID# 3085.) As set out above, Supreme Court and Sixth Circuit precedent holds that a showing of actual harm is not required to show deliberate indifference. Further, the record contains evidence from which a reasonable jury could find that Rucker suffered serious declines in his health on several occasions after SCCF providers applied CoreCivic's policy preference for formulary medications to deny and delay his treatment with Advair and Spiriva.

Hininger therefore has not shown that he is entitled to summary judgment on Rucker's official capacity claim.

## IV. Recommendation

For these reasons, the Magistrate Judge RECOMMENDS that the defendants' second motion for summary judgment (Doc. No. 273) be DENIED.

Any party has fourteen days after being served with this Report and Recommendation to file specific written objections. Failure to file specific objections within fourteen days of receipt of this report and recommendation can constitute a waiver of appeal of the matters decided.

*Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004). A party who opposes any objections that are filed may file a response within fourteen days after being served with the objections. Fed. R. Civ. P. 72(b)(2).

Entered this 1st day of March, 2022.

ALISTAIR E. NEWBERN
United States Magistrate Judge